IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-1507
_____


FREIGHTCOR SERVICES, INC.

                                        Plaintiff-Appellee,

                        versus

VITRO PACKAGING, INC.

                                        Defendant-Appellant.

_____

    Appeal from the United States District Court for the
                 Northern District of Texas

_____

ON PETITION FOR REHEARING[*]

(Opinion June 26, 1992, 5 Cir., 1992, ___F.2d___)

(August 14, 1992)

Before GOLDBERG, JOLLY, and WIENER, Circuit Judges.


E. Grady JOLLY, Circuit Judge:


_____

    [*]The plaintiff-appellee, Freightcor Services, Inc., has filed
a petition for rehearing challenging our decision and opinion dated
June 25, 1991.  The petition for rehearing is granted; our earlier
opinion is hereby withdrawn, and the following opinion, which
differs from its predecessor in part III.B(2), is entered in its
place.

In this suit a bankrupt interstate carrier, Freightcor, Inc., seeks undercharges[1] from a shipper, Vitro Packaging, Inc. The district court rejected Vitro's defense that, under the "filed rate doctrine,"[2] Freightcor's tariff was void because it referred to a mileage guide in which Freightcor did not formally participate. The court therefore granted summary judgment for Freightcor. For the reasons below, we today hold that a mileage guide is a tariff and that a tariff that refers to another tariff without official participation in that tariff is void as a matter of law. Freightcor therefore cannot collect undercharges against Vitro under the filed rate doctrine.

I

Freightcor, now in bankruptcy, is a common carrier operating in interstate commerce and subject to regulation by the ICC. From 1985 until 1987, Freightcor hauled glass bottles and containers for Vitro. Vitro paid rates between $.98 and $1.13 per mile. All of these charges were based upon rates that were not drawn from

---

[1]"Undercharges" are the difference between the rate a shipper is billed for a shipment and the amount of the rate for that shipment according to the carrier's tariff. *See* Maislin Industries U.S., Inc. v. Primary Steel, 497 U.S. 116, ___, 110 S.Ct. 2759, 2764 (1990).

[2]The "filed rate doctrine" requires that only a tariff duly filed with the ICC can govern the billing of shipments by common carriers. The rate, however, must be reasonable. The filed rate doctrine seeks to avoid secret rates negotiated between shippers and carriers. Maislin Industries, U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, ____, 110 S.Ct. 2759, 2766 (1990).

tariffs filed with the ICC, but instead were negotiated between Freightcor and Vitro.

During these years, Freightcor had two filed tariffs that are now material. Tariff ICC FSSI 282 applied to "Building Materials or Supplies." Tariff ICC FTHS 275 applied to "Freight of all Kinds, except Class A and B Explosives, Household Goods and Materials in Bulk." The rate for ICC FTHS 275 was $3.00 per mile, and the rate in FSSI 282 was considerably less.

Both FTHS 275 and FSSI 282 computed mileage for specific shipments according to the Household Goods Carriage Bureau ("HGCB") MF-ICC 100-A Mileage Guide. The parties agree that Freightcor did not file a power of attorney or concurrence with the HGCB to "participate" in the mileage guide.

Freightcor declared bankruptcy and, as debtor-in-possession, sued Vitro in U.S. district court for undercharges, or the difference between the rate actually charged and the rate posted in a carrier's applicable tariff on file with the ICC. Vitro answered alleging, among other defenses, that the proper forum for this dispute is the ICC, that the tariffs Freightcor sought to apply were void because Freightcor had not participated in the mileage guide these tariffs referred to, that an attempt to collect filed rates after negotiating a lower rate was an unreasonable practice, and that the rates sought were unreasonable. Freightcor moved for summary judgment, arguing that, under the filed rate doctrine, the sole question for the court was whether Vitro had paid the amount

of money required in the duly filed tariffs that governed Freightcor's shipments of Vitro's cargo. The court initially denied the motion, noting that a factual dispute persisted concerning the applicability of FSSI 282: whether glass bottles and containers, which Freightcor had hauled for Vitro, were included within the term "Building materials or supplies" as found in FSSI 282.

On March 15, 1991, however, the court granted reconsideration. The court rejected Vitro's defenses and held that FTHS 275 had properly referred to mileage guide HGCB MF-ICC 100-A. The court further held that, although there was a dispute with respect to the applicability of FSSI 282, there was no factual dispute as to the applicability of FTHS 275, which covered "freight of all kinds." The court therefore held that FTHS 275 was applicable. It noted, however, that because Freightcor had also contended, *viz.*, "conceded," that FSSI 282 was also applicable, the court would apply the lower rate under FSSI 282 and assess Freightcor's damages on that basis. In so doing, the court observed it was undisputed that when two tariffs are applicable, the proper rate to apply is the lower rate. Because Freightcor had contended that both FSSI 282 and FTHS 275 were applicable, it could not complain that the district court applied the lower rate to assess undercharge damages. Judgment was entered for $19,199 in principal and $5,449 in prejudgment interest. Vitro filed a motion for "new trial," which was denied. Vitro then filed this appeal.

II

We review <u>de novo</u> the summary judgment, applying the same standards of law as those available to the district court. <u>Trial v. Atchison, Topeka and Santa Fe R. Co.</u>, 896 F.2d 120, 122 (5th Cir. 1990). Therefore, to sustain the summary judgment rendered below, we must find that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

III

The heart of Vitro's appeal is its argument that the district court erred in applying the filed rate doctrine based on Freightcor's tariff FTHS 275. Vitro argues that FTHS 275 was void under ICC regulations because, although FTHS 275 refers to HGCB MF-ICC 100-A for the mileage of specific shipments, Freightcor did not give to the HGCB a power of attorney in order to "participate" in the tariff, as required by the Commission's regulations. Therefore, contends Vitro, FTHS 275 is unenforceable, and Freightcor may not collect undercharges based upon its rates. In response, Freightcor argues that the regulations do not require it to participate in the mileage guide in order to refer to it, and if they do, they still cannot be used to retrospectively void a tariff that had been otherwise duly filed and effective.

The district court found that Freightcor

permissibly referred to HGCB MF-ICC 100-A in tariff ICC FTHS 275 for the purpose of computing the distance rate. <u>See</u> 49 C.F.R. § 1312.30(c)(1). The mileage guide in question complied with 49 C.F.R. § 1312.30(c)(4) because,

> without dispute, it was on file with the ICC at the time the tariff was published and filed. The court rejects Vitro's arguments to the contrary.

Thus the district court did not expressly address the effect of Freightcor's failure to file a power of attorney with respect to the HGCB mileage guide. We read the district court's opinion as holding implicitly either (1) that the mileage guide is not a tariff, or (2) that Freightcor was not required to participate in the mileage guide, or (3) that Freightcor's mere reference to the mileage guide amounted to participation.

A

The ICC regulations make clear that whether a carrier "participates" in the tariff of another carrier or an agent is a matter of certain formalities. ICC regulation 49 C.F.R. § 1312.4(d) mandates that

> a carrier may not participate in a tariff issued in the name of another carrier or an agent unless a power of attorney or concurrence is attached. Absent effective concurrences or powers of attorney, tariffs are void as a matter of law.

The regulations do not require that Freightcor file its power of attorney or concurrence with the ICC; instead, it files such documents with the HGCB, which in turn publishes the carriers participating in MF-ICC 100-A. Freightcor did not file a power of attorney or a concurrence with the HGCB, and it therefore did not participate in the HGCB MF-ICC 100-A. The initial question for this court is, therefore, whether under the ICC's regulations

-6-

Freightcor was obligated to participate in the HGCB mileage guide in order to refer to it in Freightcor's own tariffs.

First, Freightcor argues that MF-ICC 100-A is only a distance guide and not a "tariff issued in the name of another carrier or an agent." Freightcor asserts that formal participation is only required if a carrier refers to another agent's tariffs in order to designate the rate per mile governing shipments.

We begin our inquiry, therefore, by determining whether HGCB MF-ICC 100-A is a tariff issued in the name of an agent under section 1312.4(d). "Tariff" and "agent" are defined in 49 C.F.R. § 1312.1(b).

> (2) "Agent" means a person, association or corporation authorized to publish and file rates and provisions for a carrier's account in tariffs published in the agent's name.
> .....
> (35) "Tariff" means a publication containing rates, classification ratings, rules, regulations, and other provisions as amended, filed in the carrier's or an agent's name.

Indisputably, the HGCB is an agent authorized to publish and file rates, and a mileage guide is a publication, containing provisions meant to be the basis for shipping bills, filed in an agent's name. Furthermore, HGCB MF-ICC 100-A was filed with the Commission in accordance with section 1312.30(a), as is required in order for Freightcor to refer to the guide. 49 C.F.R. § 1312.30(c)(4). The number "100-A" is assigned by the Commission to designate it as a tariff in accordance with

section 1312.8(3). Freightcor's own tariffs describe HGCB MF-ICC 100-A as a tariff.

We conclude, therefore, that HGCB MF-ICC 100-A was clearly a "tariff" as the word is used in section 1312.4(d). The conclusion that MF-ICC 100-A is a tariff does not, however, end our inquiry. We must determine whether a mileage guide, even though a tariff, is an exception to the general rule that a carrier who utilizes the tariff of another carrier or agent can only participate in that tariff by complying with the formalities of filing a power of attorney or concurrence with the issuing agent pursuant to section 1312.4(d).

No current ICC regulation specifically addresses this point.[3]

The ICC, however, has recently addressed the question and found that, under its regulations, reference to a mileage guide requires participation in that tariff. Petition of Jasper Wyman & Son, et al. re: Overland Express, Inc., ICC Case No. 40150, 8 I.C.C.2d 246 (1992). We defer to an agency's interpretation of its governing statute and regulations, and affirm that interpretation if it has a

_____

[3]ICC regulation 49 C.F.R. § 1312.27(e) provides indirect authority for such a requirement. Under section 1312.27(e), a carrier whose tariff refers to a second tariff that refers to a third tariff must either participate in the third tariff or limit its participation in the second tariff to terms that are not controlled by the third tariff. This regulation does not, however, expressly establish an obligation to participate in the second tariff.

reasonable basis in law.  <u>Western Coal Traffic League v. U.S.</u>, 719 F.2d 772, 777 (5th Cir. 1983) <u>cert. denied</u> 466 U.S. 953 (1984).

In <u>Jasper Wyman</u>, the Commission addressed the fundamental argument made by Freightcor:  that section 1312.30(c)(4)[4] requires only that tariffs be on file in order to refer to them; consequently, a carrier, who only refers to a mileage table, is not required to participate in that tariff.  In supporting that contention, Freightcor points out that in adopting 1984 amendments to Commission's regulations, the ICC eliminated the explicit requirement that carriers must participate in a mileage guide.[5]

The ICC, however, found that the excising of the language only removed a redundant requirement to participate in the

---

449 C.F.R. § 1312.30(c)(4) provides

Except as provided in § 1312.13(e)(2), only distance guides on file with the Commission may be referred to.  More than one may be referred to provided the rate tariff clearly specifies the circumstances under which each guide will apply.  An agent's tariff may refer to another agent's distance guide.

Section 1312.13(e)(2) provides that rules published by the federal government need not be separately filed with the Commission.

[5]Prior to 1984, section 1310.16 provided

Only distance guides officially on file with the Commission may be referred to.  More than one may be referred to provided the rate tariff clearly specifies the circumstances under which each guide will apply. <u>All carriers parties to distance rates referring to one or more distance guides must also be parties to each guide referred to.</u> An agent may refer to a distance guide published in the name of another agent for the account of participating carriers also parties to the guides.

When this section became effective as revised section 1312.20, the underlined language was omitted.

tariffs of other carriers, Jasper Wyman, 8 I.C.C.2d at 251, which was set out at 49 C.F.R. § 1312.25. Furthermore, the ICC found that the elimination of the redundant language allowed carriers, who, as private entities, could not be "parties" to government distance guides, to nevertheless use those guides. Therefore, the ICC held that the requirement of section 1312.4(d) to participate formally in the tariffs of another agent continued to apply to mileage guides. Jasper Wyman, 8 I.C.C.2d at 252.

The ICC's ruling -- that mileage guides are tariffs, that carriers must participate in mileage guides as in any other tariff, and that the 1984 amendments did not remove this requirement to participate in mileage guides -- has a reasonable basis in law. As to the first prong of the ruling, we have independently determined above that mileage guides are clearly tariffs. As to the next prong of the ruling, the Interstate Commerce Act does not distinguish between one form of tariff and another in requiring Commission regulation of joint tariffs. 49 U.S.C. § 10762(a)(1). Moreover, the text of section 1312.30(c)(4) establishes no exception to the general obligation placed upon a carrier whose tariff is governed by the terms of the tariff of another carrier or agent: it must formally participate in the tariff of the other carrier or an agent. As to the last prong of the holding, the Commission's view that the 1984 amendments did no more than

delete a redundant regulation is a plausible explanation for what occurred.

We hold, therefore, that section 1312.4(d) requires that a carrier who refers to the mileage guide of another carrier or agent to participate in that mileage guide. Thus, because FTHS 275 referred to the mileage rates of HGCB MF-ICC 100-A, Freightcor was required under section 1312.4(d) to participate in HGCB MF-ICC 100-A. Freightcor filed neither a power of attorney nor a concurrence with HGCB to participate in MF-ICC 100-A. Accordingly -- under regulation 1312.4(d) -- FTHS 275 was "void" as a matter of law.[6]

---

[6]Freightcor argues that a mere irregularity in the tariff is no basis for the ICC to void the tariff, because the tariff is in substantial compliance. Freightcor cites Genstar Chemical Ltd. v. ICC, 665 F.2d 1304 (D.C.Cir. 1981) cert. denied Nitrochem, Inc. v. ICC, 456 U.S. 905 (1982); Davis v. Portland Seed Co., 264 U.S. 403 (1924); and Berwind-White Coal Mining Co. v. Chicago & E. R. Co., 235 U.S. 371 (1914), in support of this position.

In Jasper Wyman, the ICC distinguished these cases as being suits on effective tariffs that did not conform to a regulation, as opposed to tariffs that are void or otherwise ineffective. (In Berwind-White, the tariff's failing was in not conforming to page format requirements; in Davis, the rate was too high, and in Genstar, there was an insufficient period of notice prior to the effective date.) Certainly, none of the cases were based on a statutory or regulatory provision stating that the "tariff is void as a matter of law."

We need not reach this question of substantial compliance, as there is no question but that Freightcor did not comply at all, much less substantially, with section 1312.4(d), which defines nonconforming tariffs as void. We therefore will concern ourselves with the operation and validity of section 1312.4(d) and do so according to the standards set out in ICC v. American Trucking Assos., Inc., 467 U.S. 354 (1984), which is more recent than the cases indicated by Freightcor.

Freightcor argues, however, that, even if section 1312.4(d) applies to mileage guides, its tariffs are not void because the ICC is without authority to issue regulation 1312.4(d) to the extent that it retrospectively voids a tariff that has been approved by, and is on file with, the ICC. Here, for example, Freightcor contends that it duly filed its tariff FTHS 275 with the ICC, and the ICC accepted that tariff; accordingly, it is an effective rate. The ICC, it argues, has no authority to promulgate a regulation that retrospectively voids this effective tariff.

(1)

Freightcor relies on the Supreme Court's opinion ICC v. American Trucking Assos., Inc., 467 U.S. 354 (1984), and its simultaneous remand of Aberdeen & Rockfish R. Co. v. U.S., 467 U.S. 1237 (1984), in contending that its tariffs are not void pursuant to the terms of section 1312.4(d). In doing so, Freightcor acknowledges that this circuit has upheld the authority of the ICC to issue regulations that void effective tariffs. Aberdeen & Rockfish R. Co. v. U.S., 682 F.2d 1092 (5th Cir. 1982). It asserts, however, that by vacating Aberdeen & Rockfish, the Supreme Court precluded our reaching that result in this case. We disagree.[7]

---

[7]The Supreme Court, in Aberdeen & Rockfish, 467 U.S. 1237 (1984), vacated and remanded Aberdeen & Rockfish R. Co. v. U.S., 682 F.2d 1092 (5th Cir. 1982), for reconsideration in the light of

In _American Trucking_, the Supreme Court reviewed a holding of the Eleventh Circuit that although the ICC clearly had authority to reject proposed tariffs that did not conform to rate bureau requirements, the ICC lacked the express statutory authority to reject retrospectively a tariff that had been on file with the ICC and applied by the carrier in the conduct of its business; or, in short, the appellate court held that the ICC lacked the authority to reject, retroactively, effective tariffs. _American Trucking Assos. v. U.S._, 688 F.2d 1337 (11th Cir. 1982).

---

_American Trucking_. Freightcor argues that this remand overruled our opinion rather than merely vacating it.

In _Aberdeen & Rockfish_, we considered an ICC regulation providing that tariffs that did not contain certain symbols denoting rate changes would be unenforceable, even if the tariffs were duly filed with the ICC. We held that the ICC did not abuse its discretion by adopting the regulation, and it was consequently enforceable. The Supreme Court granted certiorari in _American Trucking_ and _Aberdeen & Rockfish_ because the Eleventh Circuit opinion conflicted with our opinion in _Aberdeen & Rockfish_. _American Trucking_, 467 U.S. at 358. Ultimately, the Supreme Court reversed the Eleventh Circuit's holding that the ICC may not enforce rate bureau agreements by rejecting effective tariffs. _Compare_ _American Trucking_, 467 U.S. at 370 _to_ _American Trucking_, 688 F.2d at 1354; _on remand_ _American Trucking Assos. v. United States_, 744 F.2d 754 (11th Cir. 1984), _cert. denied_ 467 U.S. 1240.

The Supreme Court merely vacated the judgment in _Aberdeen & Rockfish_ and remanded it to this court "for further consideration in light of" _American Trucking_. _Aberdeen & Rockfish_, 467 U.S. 1237 (1984). This court then remanded the case to the ICC where it became moot when the ICC repealed the regulations that were the subject of the suit. 49 Fed.Reg. 38641 (1985). Although it is certainly true that our opinion was vacated in _Aberdeen & Rockfish_, it is incorrect to assume that the Supreme Court's remand constituted a bar to our upholding the power of the ICC to void an effective tariff.

The Supreme Court agreed that the Motor Carrier Act, 49 U.S.C. § 10762(e), does not **expressly** authorize the Commission to reject effective tariffs -- a holding that Freightcor suggests controls our case today. <u>American Trucking</u>, 467 U.S. at 364. This holding, however, did not resolve the issue presented. The court proceeded further to hold that the Commission has discretion to develop extrastatutory remedies, including the remedy of voiding effective tariffs. <u>American Trucking</u>, 467 U.S. at 370. In exercising this discretionary power, however, the Court prescribed a standard for the Commission to follow:

> To lie within the Commission's discretionary power, the proposed remedy must satisfy two criteria: first, the power must further a specific statutory mandate of the Commission, and second, the exercise of power must be directly and closely tied to that mandate.

<u>American Trucking</u>, 467 U.S. at 367. The court then applied that standard to the Commission's remedy of voiding tariffs that had become effective but later were found to be in violation of agreements among members of the particular rate bureaus. The Commission argued that, after the tariff had become effective, the only appropriate remedy to address a later discovered non-conforming tariff, was voiding the tariff. The court accepted the argument, saying

> [W]e agree with the Commission that its new remedy is a justifiable adjunct to its express statutory mandate. The nullification of effective tariffs submitted in violation of rate-bureau agreements is directly aimed at ensuring that motor carriers

-14-

comply with the guidelines established by Congress...

467 U.S. at 370. Accordingly, the Supreme Court reversed the Eleventh Circuit's holding that the ICC lacked the power to enforce rate bureau agreements by voiding effective tariffs. American Trucking, 467 U.S. at 370.

(2)

Our question is then, in the light of American Trucking, whether section 1312.4(d) -- in retrospectively voiding a non-complying tariff -- is within the ICC's statutory authority. Applying the standards set down by the Supreme Court, we will uphold the power claimed by the ICC in its regulation if (1) the power furthers a specific statutory mandate of the Commission, and (2) the exercise of power is directly and closely tied to that mandate. American Trucking, 467 U.S. at 367.[8]

Before we apply American Trucking's two-step test, we briefly restate the power claimed by the Commission in our case today: the authority to declare "void as a matter of law" a carrier's tariffs that refer to other tariffs without participation in the second tariff. This power may also be

_____

[8]We believe that the American Trucking test appropriately governs our review of section 1312.4(d), despite the procedural and substantive distinctions between 1312.4(d) (governing participation by several carriers or agents in a common tariff) and Motor Carrier Rate Bureaus -- Implementation of P.L. 96-296, 364 I.C.C. 464 (1980)(governing the conformity of carriers' tariffs to applicable agreements of rate bureaus to which the carriers belonged), the ruling of the Commission considered by the American Trucking court.

characterized as a power to determine whether a tariff is effective.  Jasper Wyman, 8 I.C.C.2d at 258.  In other words, section 1312.4(d) does not authorize the ICC to act affirmatively to void a tariff.  This regulation defines when a tariff became effective or becomes void through the action or inaction of a carrier.

The first inquiry that American Trucking requires us to make is whether this power claimed by the Commission furthers a statutory mandate.  The relevant statutory mandate is in the Interstate Commerce Act, under which the Interstate Commerce Commission has jurisdiction to regulate the tariffs of interstate motor common carriers.[9]  Congress first set forth the transportation policy it intends to govern interstate carriers in the Interstate Commerce Act, 24 Stat. 379 (1887), which has been refined in its amendments and successor acts, particularly, the Interstate Commerce Act of 1978, 92 Stat. 1337, and the Motor Carrier Act of 1980, 94 Stat. 2013.  This policy is currently codified at 49 U.S.C. § 10101.  As goals

---

[9]Subchapter II of section 105 of the Interstate Commerce Act provides, in part,
    ...[T]he Interstate Commerce Commission has jurisdiction
    over transportation by motor carrier ... to the extent
    that passengers, property, or both are transported by
    motor carrier (1) between a place in -- (A) a State and
    a place in another State; ..... (2) ... or on a public
    highway.
49 U.S.C. § 10521.

of this policy, federal regulation of transportation should promote fairness and efficiency.[10]

The courts have long recognized that a central purpose underlying the transportation policy of the Interstate Commerce Act is a Congressional mandate that the ICC regulate the relationship between carriers and agents to prevent secrecy in the negotiation of tariffs, which promotes discrimination, favoritism, market inefficiency, and artificially high rates. *See* Maislin, 110 S.Ct. at 2768, *quoting* Armour Packing Co. v. United States, 209 U.S. 56, 81 (1908). Simply put, public disclosure of the parties to each tariff promotes fairness and helps to level the playing field on which the players must know whom they are playing with and against. *See, e.g.,* Kansas City Southern R. Co. v. C.H.

_____

[10]49 U.S.C. § 10101(a)(1) provides, in part,
It is the policy of the United States Government .....
(B) to promote safe, adequate, economical, and efficient transportation;
(C) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;
(D) to encourage the establishment and maintenance of reasonable rates for transportation, without unreasonable discrimination or unfair or destructive competitive practices....
Furthermore, the statutory policy is directed specifically to regulate transportation by motor carrier to promote competition and efficiency so that motor carriers' services will, in sum,
(A) meet the needs of shippers, receivers, passengers, and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and travelling public...
49 U.S.C. § 10101(a)(2).

Albers Comm. Co., 223 U.S. 573, 597 (1912)(secret agreements between shipper and carrier forbidden).

In support of this policy, the Interstate Commerce Act specifically requires the ICC to regulate the relations among motor common carriers that have entered into joint tariffs. 49 U.S.C. § 10762(a)(1) provides, in part,

> .... A motor common carrier shall publish and file with the Commission tariffs containing the rates for transportation it may provide under this subsection. The Commission may prescribe the other information that motor common carriers shall include in their tariffs. .....

Thus, each motor carrier is required by statute to publish and file with the Commission all tariffs containing rates. The Commission, moreover, is under an express mandate -- distinct from the mandates of the statute imposed on carriers -- both to determine the nature of the information the carrier must file in each tariff and to require that this information be provided. Within this mandate to require certain information, and in the light of the policy against allowing secret agreements, we believe it is necessary, practically, for the Commission to require the identification of each participant in every tariff.[11]

_____

[11]As well as this general mandate of the ICC to set requirements for joint tariffs, the ICC is specifically required to monitor the use of joint classifications and rates, as well as the division of revenues collected pursuant to charges under joint rates among shippers. 49 U.S.C. § 10705(b)(1) provides:
> The Interstate Commerce Commission may, and shall when it considers it desirable in the public interest, prescribe ... joint classifications, joint rates, (including

In sum, the congressional mandate to the ICC is that the Commission must maintain a fair and efficient transportation market, which, at the very least, does not permit secret negotiations and arrangements between carriers and shippers. Mindful of this policy, the Commission is specifically under a statutory mandate to determine what information must be provided in every joint tariff and provide mechanisms to ensure that this information is provided and is accurate. Pursuant to this obligation, we believe that there is a strong presumption that the Commission must require the disclosure of the identity of the carriers participating in every tariff.

Our second step in applying the American Trucking test is to determine whether the ICC's regulation -- which requires that a tariff is void if the participating carrier fails to

---

maximum and minimum rates or both), the division of joint rates ... for a motor common carrier of property providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title [*i.e.* motor carriers] with another such carrier...
Furthermore, 49 U.S.C. § 10701(a) provides:
A rate (other than a rail rate), classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 [*e.g.* motor common carriers] must be reasonable. *Divisions of joint rates by those carriers (including rail carriers) must be made without unreasonable discrimination against a participating carrier and must be reasonable.*
(Emphasis added.) Certainly, the Commission cannot monitor such joint rates and joint classifications, nor can it guard against unreasonable discrimination in the use of joint tariffs unless the participants of each tariff are identified.

follow the prescribed procedure[12] -- is directly and closely tied to the Commission's mandate under the Interstate Commerce Act. We find that this power is clearly tied to the statute as a necessary means of enforcing the Interstate Commerce Act. As we have noted, the Commission is required by statute to determine the standards for filing tariffs. The Commission is further required to determine the information that must be provided by every carrier participating with other carriers in a tariff. Finally, we have noted that the Commission is expected to further the transportation policy of the federal government, which, at the very least, bars secret arrangements among carriers and between carriers and shippers. The Commission was well within its mandate in dictating that every tariff must identify the carriers that are party to it.

In fulfilling the statutory mandate, the Commission designated participation *via* concurrence or powers of attorney. The ICC regulations prescribe a simple method for compliance with the statute and declare that tariffs that do not comply with important statutory mandates are void. Stated in another way, the regulation defines the essential elements

---

[12]49 C.F.R. § 1312.4(d). The Commission has promulgated other rules that are in furtherance of this same mandate, which are not implicated by Freightcor's argument: Each tariff must list all other tariffs that govern its terms. 49 C.F.R. § 1312.13(e). Conversely, every tariff in which carriers participate must include a section listing all participating carriers. 49 C.F.R. § 1312.13(c). The Commission has also detailed the form and scope of powers of attorney used by a carrier to participate in another carrier's or an agent's tariff. 49 C.F.R. § 1312.10(a).

of an effective tariff that refers to other tariffs that govern its terms.

Although the use of voiding as a method of compliance is potentially a harsh measure, we are satisfied that the Commission has not exceeded its discretion by determining that tariffs are void if they fail to comply with formalities that serve important statutory purposes.[13] A stricter corrective measure -- voiding tariffs and giving shippers an explicit right to overcharges -- was upheld by the Supreme Court in American Trucking to remedy non-conforming tariffs. American Trucking, 467 U.S. 370. The public policy that the Commission seeks to enforce through the exercise of this mandate is one that has long been integral to the regulation of interstate commerce: the prevention of secrecy in the dealings among carriers and between carriers and favored shippers. Thus, we conclude that section 1312.4(d) was within the Commission's statutory authority.

IV

We have thus determined that section 1312.4(d) voids as a matter of law any tariff that has not complied with the regulation's provisions. We have determined that the

---

[13]We note that, of the vast number of technical requirements the Commission has placed on tariffs, only the requirement of formal participation is enforced with the voiding mechanism. We find no other regulation in which the ICC currently requires a carrier to comply with the regulation or find that its non-conforming tariff is "void as a matter of law."

Commission has the authority to issue such a provision. Consequently, both of Freightcor's tariffs -- FSSI 282 and FTHS 275 -- are void as a matter of law because neither complied with section 1312.4(d). Therefore, Freightcor can assert neither tariff as a basis for an action for undercharges under the filed rate doctrine. Thus, the district court erred in granting summary judgment and entering judgment in favor of Freightcor. Accordingly, we reverse the district court, vacate the judgment, and remand to the district court with directions to enter a judgment for Vitro.

VACATED, REVERSED, and REMANDED.