**Robert E. BRIZENDINE, Trustee on Behalf of the Bankruptcy Estate of Brown Transport Truckload, Inc., Brown Transport Corp., and Thurston Motor Lines, Inc., Plaintiff–Appellant,**

v.

**COTTER & COMPANY, Defendant–Appellee.**

No. 92–2925.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 29, 1993.

Decided Aug. 5, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 21, 1993.

David G. Sperry, Allan D. Harris, Independence, MO, Jeffrey S. Firestone, Firestone, Liebman & Eddy, Chicago, IL, Paul O. Taylor (argued), Harris & Taylor, Bloomington, MN, Lawrence M. Liebman, Eddy & Liebman, Chicago, IL, for plaintiff-appellant.

Hugo M. Chaviano, David J. Fischer, Chaviano, Fischer, Kendle & Wahlers, Chicago, IL, William J. Augello (argued), Augello, Pezold & Hirschmann, Northport, NY, for defendant-appellee.

Before FLAUM, MANION, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

This case poses an important question under the Interstate Commerce Act (ICA): may a motor carrier collect undercharges from a shipper pursuant to a tariff that refers to a mileage guide in which the carrier did not formally "participate"? The district court granted summary judgment to the shipper on the basis of a decision by the Fifth Circuit on this issue. *See Freightcor Servs., Inc. v. Vitro Packaging, Inc.,* 965 F.2d 1339 (5th Cir.1992), *withdrawn and op. replaced on reh'g,* 969 F.2d 1563 (5th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993). We are the first circuit to address the question since a key decision of the Interstate Commerce Commission (ICC or the Commission) was reversed by the District of Columbia Circuit. *See Overland Express, Inc. v. ICC,* 996 F.2d 356 (D.C.Cir.1993), *rev'g Jasper Wyman & Son,* 8 I.C.C.2d 246, 251–52 (1992). We find the reasoning of that court persuasive, and we now agree with its conclusion that a carrier may collect undercharges pursuant to such a tariff.

Brown Transport Truckload, Inc. (Brown), was a motor common carrier operating in interstate commerce. The carrier is now bankrupt. Brown's shipping rates and other regulations were maintained in published tariffs on file with the ICC. Cotter & Company (Cotter) was one of Brown's customers. A post-shipment audit of Brown's bills by the trustee in bankruptcy revealed that Brown had undercharged Cotter by some $112,000, when the rates actually billed were compared to the rates on file with the ICC. The trustee issued balance due bills to Cotter for the undercharges; Cotter refused to pay. In litigation before the district court, Cotter's principal defense was that Brown's filed tariffs were void and could not be used to calculate rates because they violated one of the ICC's regulations governing tariff publication.

According to the ICC's regulations, a mileage rate consists of two elements: the rate per mile, and the distance between the origin and destination of shipping. *See* 49 C.F.R. § 1312.30 (1992). Carriers have three alternative methods of establishing distances: they may (1) publish the distances between all locations covered by the distance rates as part of the tariff; (2) refer to a map attached to the tariff; or (3) refer to a separately filed mileage guide. *See id.* § 1312.30(c)(1). If a carrier chooses the third method, the regulations provide that it must "participate" in any tariffs to which its own tariff refers. *See id.* § 1312.27(e). To participate, a carrier must issue a valid concurrence or power of attorney to the publisher of the mileage guide and pay a nominal fee.[1] *See id.* §§ 1312.10, 1312.4(d). The power of attorney allows the publisher to act as the carrier's agent when it files the mileage guide; in turn, the publisher

---

1. At oral argument, counsel for Cotter stated that the fee is approximately $100 per year. The District of Columbia Circuit reports that up to 40% of all carriers have not complied with the ICC's participation requirements. *See Overland,* at 358.

must file with the ICC a supplement that lists all carriers that have participated in its guide. *See id.* § 1312.25. Absent an effective power of attorney, the regulations provide that the tariff is void as a matter of law. *See id.* § 1312.4(d).

Tariff ICC BTTY 239 prescribed Brown's rates for transportation of Cotter's goods. Item 789 of that tariff set forth a rate of $1.75 per mile per truckload. Brown chose not to publish its own mileage tables. Instead, item 100 of the tariff listed as a governing publication ICC HGB 100, a mileage guide published by the Household Goods Carriers' Bureau (HGCB). Brown, however, never filed a power of attorney with HGCB, and HGCB never listed Brown as a participating carrier. As a result, the validity of Brown's tariff is in doubt. If the ICC regulations nullify Brown's tariff, then Brown has no right to collect undercharges from Cotter. If, on the other hand, the regulations cannot void a tariff that has already taken effect, then Brown may proceed with its action in the district court.

## I.

■ We begin by setting out some general principles applicable to the case. The ICA requires a motor carrier to publish its rates in a tariff filed with the ICC. *See* 49 U.S.C. § 10762 (1988). Carriers may charge only rates embodied in tariffs duly filed. *See id.* § 10761(a). Under what has become known as the "filed rate doctrine," the rate published in the filed tariff governs the legal relationship between the carrier and the shipper. As the Supreme Court has reiterated many times, a shipper cannot avoid payment of the tariff rate even if the parties agreed to a different price or if the shipper pleads ignorance of the rate on file. *See, e.g., Maislin Indus., U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); *Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); *Texas & Pacific Ry. Co. v. Mugg,* 202 U.S. 242, 245, 26 S.Ct. 628, 630, 50 L.Ed. 1011 (1906). The purpose of the doctrine is to promote uniformity and to prevent price discrimination by prohibiting secret agreements between carriers and shippers. No matter what price the parties privately negotiate, the filed rate controls. The Court has explained the logic of the doctrine as follows:

> This rigid approach was deemed necessary to prevent carriers from intentionally "misquoting" rates to shippers as a means of offering them rebates or discounts. As the Commission itself found, "past experience shows that billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored shippers, while other shippers, less fortunate in their relations with carriers and whose traffic is less important, would be compelled to pay the higher published rates."

*Maislin,* 497 U.S. at 127–28, 110 S.Ct. at 2766–67 (quoting *Poor v. Chicago, B. & Q.R. Co.,* 12 I.C.C. 418, 421 (1907)).

■ The filed rate doctrine is, however, constrained by one significant exception: the filed rate is not enforceable if the ICC finds that it is unreasonable or discriminatory. *See* 49 U.S.C. §§ 10761(a), 10701, 10741; *Maislin,* 497 U.S. at 128, 110 S.Ct. at 2767. "The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. *Unless and until suspended or set aside,* this rate is made, for all purposes, the legal rate, as between carrier and shipper." *Keogh v. Chicago & Northwestern Ry. Co.,* 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922) (emphasis added). As a result, the ICC's statutory powers to regulate motor carrier rates fall mainly into two categories. First, the ICC may reject a submitted tariff *before it goes into effect* if it contains any formal or substantive defect. *See* 49 U.S.C. § 10762(e); *ICC v. American Trucking Ass'ns, Inc.,* 467 U.S. 354, 359 n. 3, 104 S.Ct. 2458, 2461 n. 3, 81 L.Ed.2d 282 (1984). For a period of seven months thereafter, the ICC may also suspend an effective tariff in order to investigate suspected unlawfulness. *See id.* § 10708(b). Second, the ICC may review the lawfulness of a filed rate *that has gone into effect* on its own motion or by complaint at any time. If the rate is found to be unreasonable, then the ICC has the power to prescribe a new rate. *See* 49 U.S.C. § 10704(b)(1). Unreasonable or dis-

criminatory rates may precipitate an action by a shipper for "reparations" from the carrier. *See* 49 U.S.C. § 11705(b)(3); *American Trucking,* 467 U.S. at 361 n. 5, 104 S.Ct. at 2462 n. 5 (citations omitted). The shipper may also assert the unlawfulness of the rate as a counterclaim or defense to an action for undercharges by a carrier. *See Reiter v. Cooper,* —— U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). In either scenario, however, the damages due to the shipper will be limited to the harm caused by the violation itself—in other words, the amount by which the rate charged exceeds a reasonable rate.[2]

■ Which additional remedial powers the ICC possesses was the subject of *ICC v. American Trucking Ass'ns, Inc.,* 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984). In that case, the ICC had decided that it needed the power to reject certain tariffs that were already in effect to deter violations of "rate bureau agreements"—agreements over rates reached by groups of carriers that are immune from antitrust scrutiny. Tariff rejection, the Supreme Court explained, is a remedy of potentially devastating effect on a carrier. Whereas declaring a rate unreasonable yields damages in the amount by which the unlawful tariff was unreasonable, invalidating an effective tariff leaves a carrier without that tariff's rates on file. The carrier may, therefore, be liable in a suit brought by a shipper for the entire amount by which the rejected rate exceeds any previously effective rate. *See id.* at 358, 361 & n. 5, 104 S.Ct. at 2461, 2462 & n. 5.[3] The Court held that 49 U.S.C. § 10762(e), the ICA provision that grants the ICC its ordinary power of tariff rejection, did not authorize retroactive rejection. Section 10762(e) authorizes refusal of a submitted tariff at the threshold, the Court explained, but not revocation of a tariff that had already been accepted and had taken effect. The ICC has the discretion to develop extra-statutory remedies, however, when two conditions are satisfied: "first, the

power must further a specific statutory mandate of the Commission, and second, the exercise of power must be directly and closely tied to that mandate." *Id.* at 367, 104 S.Ct. at 2465. The Court held that the ICC was intended to be the primary enforcer of the statutory guidelines regarding collusion, and it agreed that retroactive nullification was a justifiable means of carrying out that mandate. The Court also emphasized that the potential harshness of the remedy was tempered by other steps taken by the ICC to prevent unfair applications of its new remedial power. It therefore approved the ICC's retroactive invalidation of tariffs submitted in substantial violation of rate-bureau agreements.

■ The ICC's authority to regulate motor carrier practices is not unlimited, however, especially when that authority is exercised in a way that derogates from the filed rate doctrine. In a series of decisions beginning in 1986, the ICC reconsidered whether carriers should be allowed to enforce filed rates against shippers with whom they had negotiated lower prices. The ICC announced a new policy that it would decide in each individual case whether the collection of undercharges by a carrier was an "unreasonable practice" prohibited under section 10701 of the ICA. *See National Indus. Transp. League,* 3 I.C.C.2d 99, 104–08 (1986); *Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates,* 5 I.C.C.2d 623, 628–34 (1989). In 1990, the Supreme Court emphatically rejected the ICC's new policy as inconsistent with the filed rate doctrine as it is incorporated in the ICA. *See Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The Court held that the filed rate doctrine prohibits the enforcement of privately negotiated shipping rates below the filed rates. By refusing to order collection of the filed rate solely because the par-

---

**2.** The ICC also has statutory powers to impose civil and criminal penalties. *See* 49 U.S.C. §§ 11901(b), 11914(b); *American Trucking,* 467 U.S. at 360, 104 S.Ct. at 2462.

**3.** Before 1979, it would not have been necessary for the ICC to nullify an effective tariff because all tariffs were scrutinized for defects at the

outset of the submission process. After 1979, however, budgetary cutbacks forced the ICC to inspect submitted tariffs only selectively; hence, many tariffs with obvious defects now go into effect. *See American Trucking,* 467 U.S. at 360 n. 4, 104 S.Ct. at 2462 n. 4.

ties had agreed to a lower rate, "the ICC has permitted the very price discrimination that the Act by its terms seeks to prevent." *Id.* at 130, 110 S.Ct. at 2768. The Court remarked that the ICC's policy of adhering to unfiled rates "undermines the basic structure of the Act" because the ICC cannot review in advance the reasonableness of unfiled rates. *See id.* at 132, 110 S.Ct. at 2769. *Maislin* reaffirmed the preeminence of the filed rate doctrine over any contrary regulation issued by the ICC.

## II.

The particular ICC regulations at issue in this case were first applied to effective tariffs in *Jasper Wyman & Son,* 8 I.C.C.2d 246, 251–52 (1992). As in this case, the motor carrier Overland Express had negotiated transportation rates below its filed rates with various shippers. When Overland went bankrupt, trustees of the carrier sued those shippers for undercharges. Several of the shippers filed a petition with the ICC for a declaratory order that Overland's filed rates were invalid because its tariff referred to a mileage guide in which Overland never participated. The ICC then gave notice in the Federal Register asking for comments from interested parties. *See* 56 Fed.Reg. 24,091 (1991). The ICC decided that under its tariff filing regulation, 49 C.F.R. § 1312.4(d), a tariff that is not supplemented by a required power of attorney is void as a matter of law. It concluded, therefore, that since Overland's tariff was void, there was no legal basis for its underclaim. The ICC rejected Overland's argument that its interpretation of section 1312.4(d) resulted in a retroactive rejection of Overland's tariff in violation of *American Trucking.*

After oral argument in our case, the District of Columbia Circuit struck down *Jasper Wyman* as an invalid exercise of the ICC's statutory authority. *See Overland Express, Inc. v. ICC,* 996 F.2d 356 (D.C.Cir.1993).

According to the court, the ICC's application of its regulation did in fact contravene *American Trucking.* The District of Columbia Circuit decided that the application of section 1312.4(d) to already effective tariffs was inconsistent with the filed rate doctrine. It also held that this remedy did not further any statutory mandate of the ICC.

■ Even if *Jasper Wyman* itself is no longer good law, Cotter may argue that the ICC's view in that case was nevertheless correct.[4] Toward this end, Cotter advances two arguments that the District of Columbia Circuit criticized. First, it claims that the invalidation of Brown's rates was not an act of retroactive rejection, hence *American Trucking* is not on point. Second, it claims that even if the invalidation did constitute a retroactive rejection, the ICC has the power to do so.

## A.

■ Cotter's principal contention is that the invalidation of Brown's rates is not an act of retroactive rejection because the rates themselves never became effective. Cotter argues that without a valid power of attorney submitted to HGCB, Brown had no valid mileage guide on file in its own name. Without a valid mileage guide, Brown's rates were critically incomplete, and Brown must therefore be considered to have no rates on file at all. The Eighth Circuit agreed with this position: "In the absence of distances to accompany distance rates, there simply is no tariff on file, notwithstanding the ICC's acceptance and publication of the rates. The rates are meaningless without the distances." *Atlantis Express, Inc. v. Associated Wholesale Grocers, Inc.,* 989 F.2d 281, 283 (8th Cir.1993).

Cotter adds that giving effect to Brown's tariffs through an undercharge suit would promote discriminatory pricing. It asserts that without a requirement of participation in

---

**4.** Because there is no rule of intercircuit stare decisis, the ICC is not bound by the decision of the District of Columbia Circuit in litigation arising in other circuits. *See generally* Samuel Estreicher & Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies,* 98 Yale L.J. 679, 735–41 (1989). Although the ICC has not at-

tempted to revive the *Jasper Wyman* rule in any other case, it likely will, given its publicized unhappiness with the *Overland* result. *See* Public and Media Advisory, ICC News (June 28, 1993). Hence, we can still evaluate Cotter's arguments that the ICC's interpretation of its regulations in *Jasper Wyman* was correct.

referenced mileage guides, "a carrier [could] bill[ ] a favored shipper a rate based on a shorter distance route between two points than it used to bill a less-favored shipper shipping between the same two points."[5] Appellee's Br. at 14. Along the same lines, the Third and Fifth Circuits decided that requiring participation serves the ICA's goal of preventing the secret negotiation of tariffs, which can lead to unfair prices. Public disclosure of all the parties involved in every tariff—which occurs when the publisher of the mileage guide files the list of all participating carriers—eliminates any element of secrecy. *See Security Servs., Inc. v. K Mart Corp.*, 996 F.2d 1516, 1524 (3d Cir.1993); *Freightcor Servs., Inc. v. Vitro Packaging, Inc.*, 969 F.2d 1563, 1570–71 (5th Cir.1992), *cert. denied,* ── U.S. ──, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993).

 Contrary to Cotter's position, the rule is well-established that rates accepted by the ICC and in effect are enforceable. "Carriers have traditionally been permitted to enjoy [repose] once their tariffs have been accepted by the Commission." *American Trucking*, 467 U.S. at 364 n. 7, 104 S.Ct. at 2464 n. 7. Under the filed rate doctrine, even tariffs that contain substantively unlawful rates or violate ICC filing rules are not nullities. The shipper must pay the rate on file, and may then sue for the harm, if any, caused by the tariff's unlawfulness or irregularity. *See Davis v. Portland Seed Co.*, 264 U.S. 403, 44 S.Ct. 380, 68 L.Ed. 762 (1924) (tariff enforceable despite unlawful rates); *Berwind–White Coal Mining Co. v. Chicago & E. R.R.*, 235 U.S. 371, 35 S.Ct. 131, 59 L.Ed. 275 (1914) (tariff enforceable despite nonconformity to page format requirements); *Genstar Chemical Ltd. v. ICC*, 665 F.2d 1304 (D.C.Cir.1981) (tariff enforceable despite in-

sufficient period of notice prior to its effective date), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982).[6] The enforceability of published rates, however defective, discourages the parties (especially shippers, who may face undercharge suits later) from bargaining for other prices. The ICC itself has until recently taken the view that tariffs filed in a technically deficient manner are not void and that a shipper's recovery for any deficiency is limited to actual damages. *See American Trucking*, 467 U.S. at 364 n. 7, 104 S.Ct. at 2463 n. 7 (citing *Boren–Stewart Co. v. Atchison, T. & S.F. R. Co.*, 196 I.C.C. 120 (1933) and *Acme Peat Prods. v. Akron, C. & Y.R. Co.*, 277 I.C.C. 641 (1950)).

 *American Trucking* makes clear that a carrier's submitted rate becomes the legal, governing rate when the ICC accepts it. *See American Trucking*, 467 U.S. at 360–61, 363 n. 7, 104 S.Ct. at 2462, 2463 n. 7.[7] *Maislin* adds that the filed rate doctrine trumps any contrary regulation promulgated by the ICC. The fact that the ICC interprets 49 C.F.R. § 1312.4(d) as a regulation that helps *define* whether a rate is filed does not allow the ICC to escape the strictures of *Maislin*. "Stripped of its semantic cover," this application of section 1312.4(d), like the policy analyzed in *Maislin*, "stand[s] revealed as flatly inconsistent with the statutory scheme as a whole . . . and §§ 10761 and 10762 [the filed rate doctrine] in particular." *Maislin*, 497 U.S. at 131, 110 S.Ct. at 2768.

 It is true that if a carrier has no rates on file whatsoever, then a court has nothing to enforce; only the ICC can set rates. But surely Brown's tariff provided sufficient information about its rates to give

---

**5.** As an intuitive matter, it may seem difficult to imagine how a mileage guide can differ substantially from one carrier to the next. The shipping distance between two points, however, varies according to the route chosen. *See Security Servs., Inc. v. K Mart Corp.*, 996 F.2d 1516, 1520 (3d Cir.1993).

**6.** Cotter attempts to distinguish these cases by claiming that they were "suits on effective tariffs that did not conform to a regulation, as opposed to tariffs that are void or otherwise effective." Appellees' Br. at 18 (quoting *Vitro*, 969 F.2d at

1568 n. 6). But this case is also a suit on an effective tariff that did not conform to a regulation. We see no important difference between the two. *See Overland*, at 360 n. 5.

**7.** In a recent statement, the ICC acknowledged that the general rule is "tariffs on file with the Commission are considered effective, filed tariffs, even though later determined to be unlawful for some reason." *Curriculum Assocs., Inc.*, No. 40380, slip op. at 7–8 (I.C.C. Oct. 16, 1992) (citing cases).

notice to its customers about the price of shipping. Any shipper who consulted Brown's tariff would find the rate per mile and would know where to look—namely, to another tariff on file with the ICC—to determine the distance. The ICC, too, would be fully capable of reviewing the reasonableness of Brown's filed rates on the basis of the information supplied. Indeed, the only way a curious shipper would ever know that Brown failed to submit a power of attorney to HGCB would be if it looked up Brown's filed rate; saw that the tariff refers to HGCB's mileage guide; inspected the mileage guide; noticed that page two of the guide states that it applies only to participating carriers listed in a supplement; turned to the supplement; and discovered that Brown's name was missing. *See Overland*, at 360–361.[8]

It is difficult to understand, despite Cotter's claims, how the practice of failing to file a power of attorney would lead to price discrimination. Again, Brown's tariff rate was not secret; anyone who consulted it could compute the price of shipping. The presence or absence of a separately filed power of attorney would change nothing. In fact, relieving shippers of the requirement that they must pay rates on file because a formality is missing would do far more to upset the uniformity of pricing than refusing to enforce their tariffs. Like the policy struck down in *Maislin*, the ICC's policy here would "sanction[ ] adherence to unfiled rates, [and thus] undermine[ ] the basic structure of the Act."

*Maislin*, 497 U.S. at 132, 110 S.Ct. at 2769; *see also Overland*, at 361.

## B.

Even if Brown's tariff took effect, the ICC may have the power to reject it retroactively if invalidation furthers some statutory mandate of the ICC. As quoted above, the Third and Fifth Circuits held that the statutory mandate for retroactive application of section 1312.4(d) is the ICC's duty to make public all information regarding interstate shipping rates. But again, it is difficult to see how failure to file a power of attorney would adversely affect the uniformity of pricing. The true purpose of the participation rule may be the facilitation of the ICC's ability to monitor the shipping market. Requiring that every publisher of a tariff list all the other carriers that have also signed onto that tariff enables the ICC to see, at a glance, how many carriers' rates are being controlled by a single tariff. Publishing that list provides no new information that is not available by inspecting each carrier's tariff individually—it simply collects it in one convenient place.

This reason might explain why the ICC has taken such a strong interest in punishing the failure to file powers of attorney. The ICC, however, has not in fact offered it as a justification for its application of 49 C.F.R. § 1312.4(d). We also question whether such a goal, regardless of its validity, would be backed by a "specific statutory mandate" of the kind *American Trucking* requires.[9]

8. If a shipper were to discover that the carrier had failed to submit the appropriate power of attorney, that might cause it to question the validity of the tariff, but not the efficacy of the rate. The District of Columbia Circuit observes, pointedly, that the section of the ICA that codifies the filed rate doctrine does not make every defect disqualifying. It provides only that a "carrier may not charge or receive a different compensation for that transportation or service than the *rate* specified in the tariff." 49 U.S.C. § 10761(a) (emphasis added). The court speculates that this may explain why there is a filed *rate* doctrine rather than a filed *tariff* doctrine. *See Overland*, at 361.

If a shipper came to doubt the validity of the carrier's tariff for this reason, the appropriate action would be to demand of the carrier that it file the proper documents before any business was transacted. It may seem inequitable to put

that burden on the shipper, but it is the filed rate doctrine itself that exposes shippers who negotiate private agreements to the risk that they will eventually be made liable for the filed rates. *See Maislin*, 497 U.S. at 131 n. 12, 110 S.Ct. at 2769 n. 12.

9. Elsewhere, the ICC seems to suggest another possible reason for requiring the filing of a power of attorney—that it is in the filing carrier's own best interest. The ICC states that the power of attorney creates an agency relationship between the carrier and the mileage guide publisher that shows that the former "accepts responsibility for, and has participated in any ... changes made by" the latter. *Wonderoast, Inc.*, 8 I.C.C.2d 272, 1992 WL 24807, at *4, 1992 MCC LEXIS 12, at *13 (Feb. 5, 1992). Without such a requirement, "the carriers parties to the [rate] could take independent action binding on other

Even if there were a statutory mandate furthered by this action, the remedy of retroactively declaring void any tariff that was not accompanied by a valid power of attorney would not seem closely tied to that policy. *American Trucking* made clear how extraordinary a remedy is retroactive rejection of a tariff, in light of its potentially ruinous effect on a carrier. The Court approved that remedy in *American Trucking* partly because it accepted the ICC's argument that its ordinary remedies were unlikely to prove effective in deterring violations of rate-bureau agreements. In this setting, on the other hand, the ICC has not argued that the imposition of ordinary damages would fail to deter sufficiently this conduct. *See Overland,* at 361.

Moreover, the *American Trucking* Court partly based its approval of retroactive rejection on the existence of safeguards taken by the ICC to ensure that the penalty would not be imposed unfairly. For example, the ICC indicated that it would nullify tariffs "only upon findings of substantial violations" of which the offending carriers would necessarily have been aware. The ICC's plan also contemplated a system of full hearings and judicial review. Because none of these safeguards are present in this context, we agree with the District of Columbia Circuit that retroactive rejection is an inappropriate remedy here.

### III.

We hold that a carrier may sue for undercharges pursuant to a tariff on file with the ICC, even if that tariff refers to a mileage guide in which the carrier did not formally participate. The judgment of the district court is therefore REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

carriers, and by such independent action could impose ... provisions upon all other carriers with whom they interchange traffic." *Id.* at *4, 1992 MCC LEXIS 12, at *12 (citation omitted). It is unclear why the decision to adopt the publisher's mileage guide as its own does not by itself demonstrate that the carrier accepts responsibility for the publisher's guide. Moreover, it is unclear why the carrier's failure to protect its own interests provides a reason to invalidate the rates it does have on file.