**OVERLAND EXPRESS, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION,**
**Respondent,**

**Jasper Wyman & Son, et al., Household Goods Carriers' Bureau, Inc., The Kroger Co., Intervenors.**

**No. 92–1037.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 1993.

Decided June 22, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 22, 1993.

---

Joseph L. Steinfeld, Jr., Washington, DC, argued the cause for petitioner. With him on the briefs were Robert B. Walker and John T. Siegler, Washington, DC.

Judith A. Albert, Atty., I.C.C., Washington, DC, argued the cause for respondent. With her on the brief were Robert S. Burk, Gen. Counsel, I.C.C., Ellen D. Hanson, Sr. Associate Gen. Counsel, I.C.C., Robert B. Nicholson and John P. Fonte, Attys., Dept. of Justice, Washington, DC.

William J. Augello, Huntington, NY, argued the cause for intervenor Jasper Wyman & Son, et al.

Thomas M. Auchincloss, Jr. and Leo C. Franey, Washington, DC, were on the brief for intervenor Household Goods Carriers' Bureau, Inc.

Terrance D. Jones and William H. Borghesani, Jr., Washington, DC, entered an appearance for intervenor The Kroger Co.

Before EDWARDS, RUTH BADER GINSBURG, and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioner, a bankrupt carrier, challenges the Interstate Commerce Commission's (ICC's) order declaring that the carrier's rates were never effectively on file with the Commission. We agree with petitioner that the Commission's ruling conflicts with Supreme Court precedent, and therefore, we grant the petition for review.

## I.

In the early 1980s, the federal government began to deregulate the transportation industry. As part of that process, the ICC relaxed many of its cumbersome rate filing and approval procedures with which motor carriers had to comply. Even the new, less stringent, requirements were too burdensome for many carriers who, caught up in the spirit of competition, negotiated rates with shippers without regard to the rates on file with the Commission. In many cases, these negotiated rates were far below the carriers' filed rates.

The shippers gladly accepted these low rates. Most of the shippers must have known that under the filed rate doctrine (which is an integral part of the Interstate Commerce Act (ICA), see 49 U.S.C. § 10761(a), and has been consistently followed by the Supreme Court since at least 1915) the carriers had a legal right to collect the full amount of the filed rate no matter how clearly a shipping contract reflected a lower rate. See Louisville & Nashville R. Co. v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915) ("Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed."). Presumably the shippers reasoned that carriers would respect the lower negotiated rates because, in a competitive market, a carrier would commit commercial suicide by demanding the filed rate. The shippers apparently did not foresee that the process of opening up a previously heavily regulated market to the forces of competition would push some of the less efficient firms out of the market. And although the shippers were correct to think that active carriers would not insist on the higher filed rates, the same logic did not apply to the trustees of bankrupt carriers whose only incentive was to increase the size of a bankrupt's asset pool.

By the mid–1980s, a number of trustees had billed shippers for the difference between the filed and negotiated rates and, upon the shippers' refusal to pay, had brought undercharge suits. The shippers understandably characterized these suits as grossly inequitable and argued that the Commission should invalidate the filed rates pursuant to its power to regulate unreasonable practices. The Commission, realizing that the undercharge suits resulted from and were contrary to the spirit of its deregulatory efforts, agreed with the shippers. See National Indus. Transp. League, 3 I.C.C.2d

99, 104–08 (1986) *(Negotiated Rates I); Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates,* 5 I.C.C.2d 623, 628–34 (1989) *(Negotiated Rates II).*

The Supreme Court, however, when it faced the issue in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), disagreed with the Commission and the shippers. The Court rejected the Commission's determination that the bankrupt carriers' trustees' attempts to recover the difference between the filed and unfiled rates—after they had negotiated, billed, and collected the lower rates— were an unreasonable practice. *See id.* at 130–31, 110 S.Ct. at 2768. The Court held that the Commission's ruling eviscerated the filed rate doctrine and interfered with the ICA's goal of ensuring nondiscriminatory pricing. The purpose of the filed rate doctrine, the Court reasoned, is to prevent carriers from discriminating among customers, for example, by charging shippers higher rates on less competitive routes. And the filed rate doctrine and the ICA cannot be enforced if carriers (or trustees) are prevented from collecting the filed rate. *See id.* at 132–33, 110 S.Ct. at 2769.

After their blanket challenge to the trustees' undercharge suits was rejected in *Maislin,* shippers had to develop more creative defenses that were designed to avoid running afoul of the filed rate doctrine. This case involves one such attempt.

The trustees of the bankrupt Overland Express sued a number of shippers for undercharges in the Southern District of Indiana. A group of these shippers then filed a petition with the ICC for an order declaring Overland's filed rates invalid. The shippers initiated this petition with the ICC rather than waiting for the district court to refer the cases to the Commission. The court

eventually did refer some of the cases, but they were never consolidated with the original petition for declaratory relief.[1]

The shippers' major contention before the Commission was that Overland's tariff referred to a separately filed mileage guide in which Overland had failed to participate, and that therefore its filed rates were defective and void as a matter of law. Understanding the shippers' claim requires a brief overview of the Commission's tariff filing regulations. A mileage rate is one of the methods that a carrier can use to charge shippers. It consists of two parts: a rate per mile and a distance between shipping points. A carrier will usually list the rate per mile in its filed tariff and can supply the distances by including a list of mileage figures in the same tariff, by attaching a map to that tariff, or by referring to a separately filed mileage guide compiled by a third party. *See* 49 C.F.R. § 1312.30(c) (1991). If a carrier chooses the third option, the ICC interprets its regulations as obligating the carrier to participate formally in the mileage guides that it incorporates by reference. *See* 49 C.F.R. § 1312.-27(e); *Jasper Wyman & Son, et al.—Petition for Declaratory Order—Certain Rates and Practices of Overland Express, Inc.,* 8 I.C.C.2d 246, 251–52 (1992).[2] Formal participation means only that the carrier must pay a nominal fee to the publisher of the mileage guide and have a valid power of attorney on file with the publisher. *See* 49 C.F.R. §§ 1312.10(b), 1312.4(d). The power of attorney allows the publisher to act as the carrier's agent when it files the mileage guide with the Commission.

Overland's tariff referred to Mileage Guide Tariff HGB 100, published by the Household Goods Carriers' Bureau. Although Overland provided the Bureau with a power of attorney in 1970, the shippers claimed that it lapsed in 1983 when Overland failed to pay

---

1. The Commission suggests that jurisdiction properly lies in the Southern District of Indiana under 28 U.S.C. § 1336(b), which gives a district court exclusive jurisdiction over cases that it previously referred to the Commission. But § 1336(b) is a narrow exception to our jurisdiction over challenges to Commission proceedings under the Hobbs Act. *See* 28 U.S.C. §§ 2321(a), 2342. We have jurisdiction over this proceeding because it was initiated by the shippers (some of whom never had their cases referred to the Commission), not referred by a district court, and was later supplemented by notice and comment proceedings.

2. Although Overland challenges this interpretation, we need not consider the validity of the Commission's construction because of our disposition of Overland's other arguments.

its nominal participation fee, and the publisher omitted Overland from the list of participating carriers. The shippers contended that the failure to maintain a *valid* power of attorney rendered Overland's filed rates void, and that therefore those tariffs could not serve as the basis for an undercharge suit. Overland's apparent oversight was not unusual. As many as 40% of all carriers failed to satisfy the formal participation requirements for their mileage guides, and shippers have challenged this practice in a number of proceedings. Recognizing the industry-wide importance of the issue, the Commission gave notice in the Federal Register soliciting comments from interested parties. *See* 56 Fed.Reg. 24,091 (1991). After reviewing the public comments and the pleadings concerning Overland in particular, the Commission decided in favor of the shippers. The Commission held that Overland, because its power of attorney had lapsed, failed to participate formally in the mileage guide. *See Jasper Wyman*, 8 I.C.C.2d at 254. The Commission noted that under its regulations, "'[a]bsent effective concurrences or powers of attorney, tariffs are void as a matter of law.'" *Id.* at 250 (quoting 49 C.F.R. § 1312.4(d)). Accordingly, the Commission determined that Overland could not sue for undercharges because there was no effective rate on file that could serve as a basis for a claim. *See id.* at 263. In a subsequent decision, the Commission dismissed the cases referred from the district court on the ground that the declaratory order in *Jasper Wyman* resolved all the pending cases. Overland filed a petition for review of the declaratory order.

## II.

Although Overland raises a number of claims, its principle contention is that the

Commission's interpretation of 49 C.F.R. § 1312.4(d) resulted in an impermissible retroactive rejection of its tariff.[3] In *ICC v. American Trucking Associations*, 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984), the Supreme Court severely limited the Commission's ability to reject tariff filings retroactively. The Court held that although the Commission could reject tariffs at the time of filing and could cancel the prospective effect of tariffs, it lacked any general authority to invalidate tariffs that it had accepted for filing without objection. *See id.* at 361–64, 104 S.Ct. at 2462–64. Therefore, the Court said that the Commission can reject a tariff retroactively only if that action "further[s] a specific statutory mandate of the Commission," and if the remedy is "directly and closely tied to that mandate." *Id.* at 367, 104 S.Ct. at 2465. Overland contends that the ICC's decision to void their filed rates years after they became effective is a retroactive tariff rejection that does not directly serve a specific statutory mandate.

The Commission believes that *American Trucking* is inapposite. Its regulation provides that "[a]bsent effective concurrences or powers of attorney, tariffs are void as a matter of law." 49 C.F.R. § 1312.4(d). The Commission explains that if a tariff is void as a matter of law, it never became effective, and because *American Trucking* only limits the Commission's ability to reject *effective* tariffs, it has no need to demonstrate that its remedy directly serves a specific statutory mandate. *Accord Atlantis Express, Inc. v. Associated Wholesale Grocers*, 989 F.2d 281, 283 (8th Cir.1993).

A careful reading of *American Trucking*, however, reveals that the Commission cannot

3. The Commission suggests that petitioner's attack on the validity of 49 C.F.R. § 1312.4(d), promulgated in 1984, violates the Hobbs Act's 60-day limitation on challenges to agency regulations. *See* 28 U.S.C. § 2344. But we generally allow claims, like petitioner's, that a regulation is in excess of statutory authority when raised as a defense to an agency enforcement action. *See NLRB Union v. FLRA*, 834 F.2d 191, 195 (D.C.Cir.1987). Although here petitioner raised the argument as a defense to the shippers' petition for a declaratory order, we do not think this slight difference in context alters the result. We also allow challenges outside the 60-day time

limit when the content of the challenged regulation was unclear prior to its application in a specific case. *See RCA Global Communications, Inc. v. FCC*, 758 F.2d 722, 730 (D.C.Cir.1985). Although the regulation at issue here did say that a nonconforming tariff would be void as a matter of law, the proceeding below was the first time that the Commission made clear that the regulation would apply retroactively. The Commission's *sua sponte* decision to open the proceeding up for third party comments demonstrates that the regulation's retroactive application was not settled law.

slip the limitation on its power to reject tariffs retroactively merely by claiming that its regulation never allowed a filed tariff to take effect. Although the Court did refer to limitations on the Commission's power to reject "effective tariffs," it used the phrase "effective tariff" simply to differentiate between the Commission's express statutory authority to reject tariffs prospectively during the application process (*i.e.,* before their *effective* dates), and the limited implicit authority to reject tariffs retroactively once they had gone into effect. *See American Trucking,* 467 U.S. at 360, 104 S.Ct. at 2462 (explaining that, "[o]ur sole concern in this case is whether . . . the Commission has the authority to reject retroactively a tariff . . . once that tariff has *gone into effect*") (emphasis added).[4] That a tariff was effective or in effect is what makes rejection retroactive. A regulation that purports to make a tariff "void" or "ineffective" if a carrier fails to follow a procedural rule, therefore, does not evade *American Trucking's* holding. The Commission is restricted whenever it attempts to invalidate (or alter the past effects of) a tariff after the application period has ended. Otherwise, shippers and carriers could not rely confidently on the rate on file with the Commission, and as explained below, the filed rate doctrine would be undermined. *See id.* at 363 n. 7, 104 S.Ct. at 2464 n. 7. In this case, the ICC did not claim any defect in Overland's filed tariff until years after its effective date.

The Commission argues alternatively that if its remedy properly is considered a retroactive tariff rejection, it still satisfies the two-part test of *American Trucking.* The Commission suggests that when a defect is apparent on the face of the tariffs filed with the Commission, its rule is a straightforward application of the filed rate doctrine incorporated in 49 U.S.C. § 10761(a). *See Freightcor Services, Inc. v. Vitro Packaging, Inc.,* 969 F.2d 1563, 1570 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 979, 122

L.Ed.2d 133 (1993). Here, we are told that a defect was discernible from Overland's filed tariffs. If a shipper had looked up the filed rate, it would have seen that Overland charges a certain rate per mile and that it refers to the Household Goods Carriers' Bureau Mileage Guide Tariff HGB 100 to determine the mileage between shipping points. If the shipper then had scrutinized the mileage guide, also a tariff on file with the ICC, it would have noticed that the guide notes on its second page that it applies only to participating carriers listed in a supplement. Turning to that supplement, the shipper would have seen that Overland was not listed as a participating carrier, and accordingly, the shipper would have concluded that Overland had failed to provide a legitimate mileage figure and that therefore its filed rate was incomplete and invalid. The Commission reasons, therefore, that Overland's tariff cannot serve as the basis for an undercharge suit consistent with the filed rate doctrine.

Although acknowledging that most shippers would not have noticed that the mileage guide was valid only for participating carriers, the Commission and intervenors remind us that the filed rate doctrine is an inflexible rule. And just as the filed rate doctrine helped the carriers in *Maislin,* here it shields shippers from undercharge suits—what is sauce for the goose is sauce for the gander. *See Jasper Wyman,* 8 I.C.C.2d at 257. The Commission thus interprets the filed rate doctrine in this proceeding as holding carriers responsible for *any* errors contained in the tariffs filed before the Commission. As long as a shipper can point to a procedural defect evident in the filed tariffs, the rate incorporated in the tariff does not apply.

The Commission's approach, although it may satisfy "poetic justice," does not meet the more straightforward demands of law; it turns the filed rate doctrine on its head. The Supreme Court has long held that a filed rate is valid despite procedural imperfections and even if it reflects a substantive violation of

---

4. The Commission's ability to reject tariffs retroactively only became an issue after 1979 when staff and budget cuts forced the Commission to abandon its policy of scrutinizing every tariff filing. *See American Trucking,* 467 U.S. at 360 n. 4, 104 S.Ct. at 2462 n. 4. After 1979, the Com-

mission began to review only a fraction of tariffs during the application stage. *American Trucking* establishes that the Commission has greatly reduced remedial authority when a defect is not noticed until after the tariff's effective date.

the ICA. *See Davis v. Portland Seed Co.,* 264 U.S. 403, 425, 44 S.Ct. 380, 385, 68 L.Ed. 762 (1924) ("The statute requires rigid observance of the tariff, without regard to the inherent lawfulness of the rates specified. It commanded adherence to the published rate ... [and] forbade any other charge.").[5] The Court has justified the doctrine and its often harsh results by explaining that:

> This rigid approach was deemed necessary to prevent carriers from intentionally "misquoting" rates to shippers as a means of offering them rebates or discounts. As the Commission itself found: "[P]ast experience shows that billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored shippers, while other shippers, less fortunate in their relations with carriers and whose traffic is less important, would be compelled to pay the higher published rates."

*Maislin,* 497 U.S. at 127–28, 110 S.Ct. at 2766 (quoting *Poor v. Chicago, B. & Q.R.R.,* 12 I.C.C. 418, 421 (1907)); *see also Louisville & Nashville,* 237 U.S. at 97, 35 S.Ct. at 495.

The Court's strict enforcement of the filed rate doctrine is, then, an unyielding insistence that the rate on file is the lawful rate. The carriers and the shippers are bound by that which is openly disclosed so as to prevent price discrimination. That purpose is hardly served, indeed it is undermined, by an ICC policy that would make the disclosed rate unreliable unless a shipper took the extraordinary step of determining whether a carrier's tariff filing was defective because its power of attorney was not up to date.[6] The section of the Act on which the filed rate doctrine is based, 49 U.S.C. § 10761(a), does not make every defect in the filed tariff absolutely disqualifying. Rather, it provides that a "carrier may not charge or receive a different compensation for that transportation or service than the *rate* specified in the tariff." 49 U.S.C. § 10761(a) (emphasis added). (It is perhaps for this reason that there is a filed *rate* doctrine rather than a filed *tariff* doctrine.)

As long as the tariff documents "were received and placed on file by the Commission without any objection whatever as to their form and ... were adequate to give notice" of the rate to be charged, the filed rate doctrine applies. *Berwind–White Coal Mining Co. v. Chicago & Erie R.R.,* 235 U.S. 371, 375, 35 S.Ct. 131, 132, 59 L.Ed. 275 (1914); *see also Genstar Chem. Ltd. v. ICC,* 665 F.2d 1304, 1308 (D.C.Cir.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982). Here, there is no doubt that Overland's filed tariffs gave shippers adequate notice of its rates. Overland's tariff clearly incorporated the mileage figures from the Household Goods Carriers' Bureau Mileage Guide Tariff HGB 100. It is true that a close inspection of HGB 100 might have raised some uncertainty in a shipper's mind about the propriety of Overland's reference to the Guide, but not any uncertainty over the rate.

The Commission does offer other statutory justifications for its rule. It points out that the Fifth Circuit has suggested that the rule furthers the specific statutory mandate that "[t]he Commission may prescribe other information that motor common carriers shall include in their tariffs." 49 U.S.C. § 10762(a)(1); *see Freightcor,* 969 F.2d at 1570. And the Commission also contends that its rule "ensures that a carrier takes

---

**5.** Attempting to distinguish *Portland Seed* and other decisions that refused to hold tariffs void despite defects, *see American Trucking,* 467 U.S. at 363 n. 7, 104 S.Ct. at 2464 n. 7, the Commission maintained that the tariffs in those cases "could be considered on file because they at least met the threshold requirement (*i.e.,* they had been sent to the Commission and had not been rejected at the outset)." 8 I.C.C.2d at 259. The same characterization, however, fits Overland's tariff to a tee. Nor do we agree with the Commission that the flaw in Overland's tariff is something more substantial than a "mere[ ] technical[ ] deficien[cy]." *Id.*

**6.** The filed rate doctrine and *American Trucking's* general prohibition on retroactive tariff rejections are interrelated—*American Trucking* limits the Commission's authority to disturb the filed rate. *See American Trucking,* 467 U.S. at 363 n. 7, 104 S.Ct. at 2464 n. 7. In effect, the two-part test of *American Trucking* allows the Commission to deviate from the filed rate doctrine only to further a specific statutory mandate. It really makes little sense, therefore, for the Commission to argue, as it does here, that retroactive rejection (that is, deviation from the filed rate) is necessary to promote the filed rate doctrine.

responsibility for establishing its own rates and is not bound by the actions of another unless it has clearly authorized the other to act on its behalf, through a continuing agency relationship."

We rather doubt that § 10762(a)(1)'s permissive authorization for the Commission to require carriers to include other unspecified information is the type of "specific statutory mandate" the Court had in mind in *American Trucking*. And the Commission does not seem authorized to reject tariffs retroactively to satisfy a *regulatory* policy not driven by a specific statutory mandate. Be that as it may, even if ensuring that carriers have valid powers of attorney on file (and guaranteeing that the mileage guide publishers are paid their membership fees) is a permissible statutory goal, the draconian remedy of retroactive rejection does not seem directly and closely tied to that policy. In approving the retroactive rejection remedy in *American Trucking*, the Court emphasized that other less drastic remedies, like actual damages, were ineffective. *American Trucking*, 467 U.S. at 369, 104 S.Ct. at 2466. Here, by contrast, if shippers or mileage guide publishers were to show that they were injured, damages presumably would be adequate to remedy the injury. *See Genstar*, 665 F.2d at 1308 (explaining that, "where the shipper has been charged no more than the rate reflected in the tariff on file, the remedy for any unlawfulness or irregularity is measured not by looking to some other tariff but by the harm, if any, caused by the unlawfulness or irregularity"). Complete abrogation of the filed rate is only necessary if the Commission's real purpose is to eliminate the trustees' undercharge suits.

Finally, *American Trucking* also stressed the procedural protections that the Commission employed to avoid inequitable results in that context. The Court noted first that tariffs would be rejected only "upon findings of substantial violations." *American Trucking*, 467 U.S. at 370, 104 S.Ct. at 2467. Second, it observed that the nature of the violations were such that "carriers who submit tariffs in substantial violation of agreements will be aware of their transgressions." *Id.* at 371, 104 S.Ct. at 2467. The Court also point-ed out that carriers would receive a full hearing subject to judicial review, and that the Commission had the discretion to withhold the sanction. *See id.* at 370–71, 104 S.Ct. at 2467. The petitioner correctly observes that few of these protections are evident in the Commission's decision. Their absence further supports our conclusion that retroactive rejection is inappropriate.

\*    \*    \*    \*    \*    \*

The Commission's declaratory order constitutes a retroactive tariff rejection in excess of its statutory authority and violates the filed rate doctrine. The petition for review is therefore granted.