**INTERSTATE COMMERCE COMMISSION, Plaintiff–Appellant,**

v.

**TRANSCON LINES, a corporation; Leonard L. Gumport, Chapter 7 Trustee, Defendants–Appellees.**

**No. 92–55036.**

United States Court of Appeals, Ninth Circuit.

Oct. 26, 1993.

Richard S. Berger, Tuttle & Taylor, Los Angeles, CA, for defendants-appellees.

Henri F. Rush, Deputy Gen. Counsel, I.C.C., Office of Gen. Counsel, Washington, DC, Stephen L. Day, Regional Counsel, I.C.C., Seattle, WA, for plaintiff-appellant.

Stanley O. Sher, Sher & Blackwell, Washington, DC, amicus curiae Intern. Broth. of Teamsters.

Joseph L. Steinfeld, Jr., Sims, Walker, & Steinfeld, and Kim D. Mann, Shawn, Mann & Niedermayer, Washington, DC, amicus curiae Creditors Alliance to Preserve Freight Undercharge Assets.

Mary Kay Reynolds, Kroll & Tract, Los Angeles, CA, for amicus curiae Transp. Claims & Prevention Council, Inc., et al.

Daniel J. Sweeney and John M. Cutler, Jr., McCarthy, Sweeney & Harkaway, for amici curiae Health and Personal Care Distribution Conference and Nat. Small Shipments Traffic Conference.

Before: BOOCHEVER, NORRIS and NOONAN, Circuit Judges.

### ORDER

The Interstate Commerce Commission (the "ICC") sued Transcon Lines ("Transcon") and its bankruptcy trustee, Leonard Gumport (the "Trustee"), to enjoin the Trustee from collecting filed freight charges. The ICC contended that the collection would violate its credit regulations. The district court granted summary judgment to the Trustee, and the ICC appealed. We affirmed in part, vacated in part, and remanded. *See ICC v. Transcon Lines*, 990 F.2d 1503 (9th Cir.1993) (*"Transcon"*). Both the ICC and the Trustee then petitioned the Supreme Court for certiorari. The Trustee's petition was denied, the ICC's granted.[1]

In a summary reconsideration order issued June 14, 1993, — U.S. —, 113 S.Ct. 2955, 125 L.Ed.2d 657 the Supreme Court vacated the portion of this court's opinion that affirmed the district court, and remanded the cause for further consideration in light of *Reiter v. Cooper*, — U.S. —, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). We now consider the effect of *Reiter* on our previous opinion.[2]

*Reiter* held that a shipper may assert "claims and defenses that are specifically accorded by the [Interstate Commerce Act ("ICA") ] itself" even though it may not raise common law claims and defenses such as ignorance and estoppel. *Id.* — U.S. at —, 113 S.Ct. at 1219. *Reiter* also held that, in response to a carrier's suit to collect the filed rate, the shipper may raise an ICA claim (in this case, a counterclaim) or defense in the very same action, pursuant to the Federal Rules of Civil Procedure. There is no requirement that the shipper "pay first"

and litigate later, *see id.* — U.S. at —, 113 S.Ct. at 1220, and the doctrine of "primary jurisdiction" does not preclude federal courts from hearing initially the claim or defense, *see id.* — U.S. at —, 113 S.Ct. at 1221. The Court added that typically, when the carrier is solvent, the equities are in favor of separate judgments on the carrier's undercharge claim and the shipper's unreasonable rate claim. However, when the carrier is insolvent, the equities change, and separate judgments may not be warranted. *See id.*

Our task is to determine how *Reiter* affects our previous opinion in *Transcon*. In *Transcon* we held that the ICC may not enforce its credit regulations when doing so would render the filed rate doctrine nugatory. Our analysis relied heavily on *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), which affirmed the centrality of the filed rate doctrine to the ICA. *See id.* at 132, 110 S.Ct. at 2769. In *Maislin*, the Court rejected the ICC's characterization of a trustee's suit for undercharges as an unreasonable *practice* within the meaning of 49 U.S.C. § 10701(a). *Maislin*, however, explicitly stated that "[t]he issue of the reasonableness of the tariff *rates* is open for exploration on remand." 497 U.S. at 129, n. 10, 110 S.Ct. at 2767, n. 10 (emphasis added). *Reiter* addresses a problem of "timing that has arisen out of that issue." *Reiter*, — U.S. at —, 113 S.Ct. at 1216.

According to the ICC, *Reiter* shows that this court read *Maislin* too broadly. The ICA specifically grants the ICC the authority to enforce its credit regulations. *See* 49 U.S.C.A. § 10743(b), § 11702(a) (West Supp. 1993). Thus the ICC argues that, under *Reiter*, the filed rate doctrine should not

---

**1.** This case's background is recited in the original opinion and will not be repeated here. *See Transcon*, 990 F.2d at 1507–11.

**2.** We interpret the summary reconsideration order to mean that the Supreme Court believes *Reiter* is sufficiently analogous to warrant specific consideration by this court. The order does not necessarily mean that the Court has a view one way or the other on whether we should change our decision. Our duty is to reconsider in light of *Reiter*, but to exercise independent

judgment in doing so. *See, e.g.,* Arthur D. Hellman, *Error Correction, Lawmaking, and the Supreme Court's Exercise of Discretionary Review*, 44 U.Pitt.L.Rev. 795, 842 (1983); R.L. Stern et al., *Supreme Court Practice* (6th ed. 1986) 280 (explaining that a summary reconsideration order means that "the lower court is being told to reconsider the entire case in light of the intervening precedent—which *may or may not* compel a different result") (emphasis added).

automatically be given priority over those regulations. Claiming that our opinion cripples its ability to enforce its credit regulations, the ICC asks us to reverse our decision in *Transcon.*

■ The ICC's argument is unwarranted by a plain reading of *Reiter.* By its clear language, *Reiter* did no more than address claims or defenses that the ICA specifically accorded to *shippers. See Reiter,* —— U.S. at ——, 113 S.Ct. at 1219. Unequivocal Supreme Court precedent holds, however, that the ICA does not confer on shippers the right to raise any claims or defenses arising from a carrier's violation of ICC credit regulations. *See Southern Pacific Transp. Co. v. Commercial Metals,* 456 U.S. 336, 352, 102 S.Ct. 1815, 1825, 72 L.Ed.2d 114 (1982). As such, the holding in *Reiter* does not directly apply to the facts of this case.

Nonetheless, the ICC insists upon a capacious reading of *Reiter.* It argues that *Reiter*'s holding applies not only to statutory claims specifically accorded to shippers but also to the claims accorded to the ICC. The ICC explains that it is not asserting the rights of shippers; instead, it is enforcing, on its own, the credit regulations validly promulgated under the ICA. Furthermore, the ICC claims that the reason why the Supreme Court did not allow shippers to raise defenses based on credit regulation violations in *Commercial Metals* was that the Court believed that the ICC had "ample authority to police the credit practices of carriers and thereby to deter improper practices." 456 U.S. at 349, 102 S.Ct. at 1823–24. The Court specifically noted that that authority included the power to seek federal court injunctions under the ICA. *See id.* Thus, the ICC claims that it is doing in *Transcon* just what *Commercial Metals* recognized that it could do: seek injunctions to enforce its credit regulations.

■ It is not necessary in this case to decide whether the ICC's reading—that *Reiter* applies not only to the claims of shippers but also to the claims of the ICC—is correct. For even if it is, the Commission has failed to demonstrate that our decision in *Transcon* was wrong. Under the ICC's reading of *Reiter,* the filed rate doctrine does not *necessarily* trump the ICC's credit regulation claims, as it would a shipper's equitable or common law defenses. The ICC therefore effectively asks us to decide which of two competing statutory claims should have priority: the carrier's claim based on the filed rate doctrine, or the ICC's claim based on the credit provisions.

In deciding which provision should be given priority, we take guidance from the Supreme Court's affirmation in *Maislin* of the vital importance of the filed rate doctrine to the ICA. *See* 497 U.S. at 132, 110 S.Ct. at 2769. Our continued reliance on *Maislin* in resolving the conflict between the filed rate doctrine and the ICC's credit regulations is entirely appropriate. Indeed, since *Reiter* was handed down, two other circuits have reaffirmed *Maislin*'s recognition of the central importance of the filed rate doctrine. *See Brizendine v. Cotter & Co.,* 4 F.3d 457, 461 (7th Cir.1993); *Overland Express, Inc. v. ICC,* 996 F.2d 356, 358 (D.C.Cir.1993).

With the teaching of *Maislin* in mind, we weigh the possible consequences of our decision. If we reverse and order summary judgment in favor of the ICC, then the ICC will be able to enjoin carriers from suing shippers for the filed rate even though the shipper itself could not rely upon the credit regulations as a defense or counterclaim. This result would permit an end-run around the filed rate doctrine. A carrier and shipper could privately negotiate a discount from the filed rate. The carrier would purposely violate various credit regulations such as 49 C.F.R. 1320.3(c), which requires the original bill to the shipper to carry a notice of the penalty for late payments. If the ICC goes along, then the filed rate doctrine would be gutted. Neither the carrier nor the shipper would protest the arrangement that they themselves have negotiated. If the ICC looks the other way, only after a carrier goes bankrupt would the illegal discount be brought to light. But because the carrier intentionally failed to give notice to the shipper, the ICC would have the power to enjoin the trustee's suit to enforce the filed rate, and the trustee would have no power to undo

the illegal bargain struck by the carrier and shipper.

On the other hand, if we reaffirm the summary judgment awarded by the district court to the Trustee, the ICC claims that it will be powerless to enforce its credit regulations. In the ICC's parade-of-horribles, the carrier may flaunt the ICC's credit regulations with impunity because the shipper, under *Commercial Metals,* and the ICC, under our holding in *Transcon,* can do nothing. But this concern is exaggerated.

The ICC has at its disposal a wide array of tools for enforcing its credit regulations. For example, the ICC may issue cease-and-desist orders, *see Southern R. Co. v. United States,* 186 F.Supp. 29 (N.D.Ala.1960), and seek federal injunctions, *see* 49 U.S.C.A. § 11702 (West Supp.1993), to force carriers to obey its credit regulations. Upon violation of such orders and injunctions, the ICC can issue substantial fines of $5,000 per day for a knowing violation of its orders, *see* 49 U.S.C.A. § 11901(a) (West Supp.1993), and request the enforcement aid of the judiciary. *See generally Commercial Metals,* 456 U.S. at 336, 102 S.Ct. at 1815 (listing enforcement tools of the ICC). The only thing that the ICC cannot do upon a violation of credit regulations is enjoin the carrier from suing the shipper for the filed rate. Since all other enforcement mechanisms remain, the claim that our opinion in *Transcon* eviscerates the ICC's power to enforce its credit regulations is overblown.

We recognize as well that we are in an unusual situation in which an agency has a record of challenging what the judiciary has interpreted to be the very heart of the statute that gave the agency life. In the past three years, the ICC has tried to undermine the primacy of the filed rate doctrine in various ways, to little success. In *Maislin Industries, U.S., Inc., v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), the Supreme Court rejected the ICC's characterization of a trustee's suit for undercharges as an unreasonable *practice* within the meaning of 49 U.S.C. § 10701(a). In *Transcon,* we rejected the ICC's claim that suits for the filed rate violated its credit regulations. More recently, in *Security Services, Inc. v. P–Y Transportation, Inc.,* 3 F.3d 966 (6th Cir.1993); *Brizendine v. Cotter*

& Co., 4 F.3d 457 (7th Cir.1993); and *Overland Express, Inc. v. ICC,* 996 F.2d 356 (D.C.Cir.1993), the Sixth, Seventh, and D.C. Circuits have rejected the ICC's attempt to argue that rates filed were void because they did not follow proper filing regulations. *But see Security Services, Inc. v. K Mart Corp.,* 996 F.2d 1516 (3d Cir.1993), *petition for cert. granted* —— U.S. ——, 114 S.Ct. 341, 126 L.Ed.2d 306 (1993); *Atlantis Express, Inc. v. Associated Wholesale Grocers, Inc.,* 989 F.2d 281 (8th Cir.1993); *F.P. Corp. v. Twin Modal, Inc.,* 989 F.2d 285 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993); *Freightcor Services, Inc. v. Vitro Packaging, Inc.,* 969 F.2d 1563 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993) (all four cases upheld the ICC rule struck down in *Overland*). It appears that in this case, the ICC has seemed less interested in enforcing credit regulations for their own sake and more interested in avoiding what it considers to be another ill-advised application of the filed rate doctrine.

In sum, *Reiter*'s plain holding does not alter our result because the ICA does not specifically accord a claim or defense to the shipper on the basis of credit regulation violations. Even if capaciously read, *Reiter* at most requires us to resolve a clash of two statutory claims. In doing so we rely upon *Maislin*'s teaching that the filed rate doctrine is "utterly central to the administration of the [Interstate Commerce] Act." *Maislin,* 497 U.S. at 132, 110 S.Ct. at 2769 (internal quotations omitted).

Finally, a comparison of the competing policies embodied in the credit regulations and the filed rate doctrine does not alter our stance. Reversing our decision would open an end-run around the filed rate doctrine, whereas reaffirming our decision would preserve the filed rate doctrine while leaving to the ICC sufficient authority to enforce its credit regulations by other means. Accordingly, the summary judgment in favor of the Trustee as to the collection of the bureau rate on overdue accounts is affirmed.