# INTERSTATE COMMERCE COMMISSION *v.* TRANSCON LINES ET AL.

No. 93–1318.  Argued November 1, 1994—Decided January 10, 1995

KENNEDY, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Wallace* argued the cause for petitioner. With him on the briefs were *Solicitor General Days, Assistant Attorney General Hunger, Michael R. Dreeben, Anthony J. Steinmeyer, Henri F. Rush, Ellen D. Hanson,* and *Evelyn G. Kitay.*

*Leonard L. Gumport* argued the cause for respondents. With him on the briefs were *Joseph L. Steinfeld, Jr., Robert B. Walker, John T. Siegler,* and *Richard S. Berger.** 

JUSTICE KENNEDY delivered the opinion of the Court.

Though recent Acts of Congress have made substantial changes in the regulation of interstate motor carriers, see Negotiated Rates Act of 1993, 107 Stat. 2044; Trucking Industry Regulatory Reform Act of 1994, 108 Stat. 1683, this case arises under the law in effect before those enactments. We address once again the Interstate Commerce Act's filed rate requirements, 49 U. S. C. §§ 10761(a), 10762(a)(1), and

---

*Briefs of *amici curiae* urging reversal were filed for the Health and Personal Care Distribution Conference, Inc., et al. by *Daniel J. Sweeney, Frederic L. Wood,* and *Nicholas J. DiMichael;* and for the Transportation Claims and Prevention Council by *William J. Augello* and *Mary Kay Reynolds.*

Briefs of *amici curiae* urging affirmance were filed for the International Brotherhood of Teamsters by *Marc J. Fink, Judith A. Scott,* and *James A. McCall;* and for Lloyd T. Whitaker as Trustee for the Estate of Olympia Holding Corp. by *Kim D. Mann.*

their bearing on the authority of the Interstate Commerce Commission (ICC) to enforce related provisions of the Act and regulations adopted under it.

Under the filed rate doctrine applicable to the transactions here in question, motor carriers were required to publish their shipping rates in tariffs filed with the ICC and to receive only the published rates. *Ibid.* Our cases have taught the necessity of strict compliance with this scheme. *E. g., Maislin Industries, U. S., Inc.* v. *Primary Steel, Inc.,* 497 U. S. 116 (1990); *Louisville & Nashville R. Co.* v. *Maxwell,* 237 U. S. 94, 97 (1915). The question now presented is whether the filed rate doctrine bars the ICC from obtaining injunctive relief to enforce its credit regulations in a manner that would prevent collection of a rate filed in a published tariff. We hold that the filed rate doctrine does not bar the injunction the ICC seeks.

I

Transcon Lines (Transcon) was once the 12th largest motor carrier in the United States, operating under authorization from the ICC. Like many other carriers, Transcon became a victim of the heightened competition resulting from Congress' partial deregulation of the motor carrier industry in 1980. See Motor Carrier Act of 1980, 94 Stat. 793. In May 1990, Transcon consented to an order for relief pursuant to an involuntary bankruptcy petition filed against it under Chapter 11. The trustee appointed by the Bankruptcy Court followed the practice of some other trustees for the estates of bankrupt carriers and sought to collect undercharges from Transcon's former customers. The trustee sought not only to collect unpaid freight charges but also to collect liquidated damages for late payment. Some 3,000 adversary proceedings brought by the trustee against Transcon's former customers are pending, and the ICC estimates the liquidated damages in question total about $15 million.

The Act bars common carriers subject to the ICC's jurisdiction from extending credit for their services except "[u]nder regulations of the [ICC] governing the payment for transportation and service and preventing discrimination." 49 U. S. C. §§ 10743(b)(1), 10743(a). By regulations under this express statutory delegation, the ICC has set out in detail the exclusive means by which common carriers can extend credit to shippers. See 49 CFR pt. 1320 (1994). Under the regulations, carriers are authorized to establish credit periods of up to 30 calendar days, §§ 1320.2(c), (d), and, if shippers fail to pay their charges within the established credit period, to assess service (or interest) charges, § 1320.2(e). Carriers also may assess liquidated damages to cover collection costs, either by a tariff rule or through contract terms in their bills of lading. §§ 1320.2(g)(1), (3). Before collecting liquidated damages by tariff rule, however, a carrier must follow specified procedural requirements.

First, the timing and conditions of any potential liquidated damages must be described clearly in the carrier's filed tariff. § 1320.2(g)(2)(i). Second, the original bill sent to the shipper must set forth any liquidated damages that would be assessed for failure to make timely payment of the freight charges. § 1320.3(c). Third, within 90 days after expiration of the authorized credit period the carrier must "issu[e] a revised freight bill or notice of imposition of collection expense charges for late payment." § 1320.2(g)(2)(vi). Finally, liquidated damages "[s]hall be applied only to the non-payment of original, separate and independent freight bills and shall not apply to aggregate *balance-due* claims sought for collection on past shipments by a bankruptcy trustee, or any other person or agent . . . ." § 1320.2(g)(2)(iii).

Upon satisfying these requirements, carriers may assess liquidated damages through a tariff rule by one of two methods. The first is "to assess liquidated damages as a separate additional charge to the unpaid freight bill." § 1320.2(g)(1)(i). The second is to charge the shipper a "full, nondis-

counted rate instead of the discounted rate [that might otherwise be] applicable." § 1320.2(g)(1)(ii). Transcon used the second, so-called loss-of-discount method to assess liquidated damages. The measure of liquidated damages under this method is prescribed by an ICC regulation. It provides:

> "The difference between the discount and the full rate constitutes a carrier's liquidated damages for its collection effort. Under this method the tariff shall identify the discount rates that are subject to the condition precedent and which require the shipper to make payment by a date certain." *Ibid.*

Transcon's customers had been charged discount rates, expressed as a percentage of a generic bureau rate. To collect liquidated damages, the trustee demanded the nondiscount bureau rate from former customers who had failed to pay their original discount charges on time.

The ICC sued in the United States District Court for the Central District of California to enjoin the trustee from collecting loss-of-discount liquidated damages. It did not allege that Transcon had failed to state its liquidated damages provisions in its filed tariff. Transcon had specified in its "rules tariff" that "discounts . . . shall apply only when tariff charges are paid within 90 calendar days from date of shipment." ICC TCON 103–A, Item 210, 1 Supplemental Excerpts of Record 41. The ICC did assert, though, that Transcon had violated each of the three other liquidated damages requirements set out above. Transcon's original bills did not advise shippers of the consequences of late payment, as required by § 1320.3(c); revised bills were not issued until several years after the 90-day period provided in § 1320.2(g)(2)(vi); and the loss-of-discount provision was being applied by a bankruptcy trustee on an aggregate basis, contrary to § 1320.2(g)(2)(iii). The requested injunction would prohibit the trustee from pursuing claims in violation of those requirements.

The District Court granted summary judgment for respondents, and the United States Court of Appeals for the Ninth Circuit affirmed in relevant part, *ICC* v. *Transcon Lines*, 990 F. 2d 1503 (1993) (as amended on denial of rehearing and rehearing en banc). The Court of Appeals understood that the ICC as a general matter is authorized to enforce its credit regulations by seeking an injunction, see 49 U. S. C. §§ 11702(a)(4), (a)(6). It also recognized, or at least implied, that the credit regulations are valid on their face, but said that "[r]egulations, however valid in other contexts, cannot furnish the reason for letting the carrier abandon the filed rate." *Transcon, supra,* at 1514. Relying on our decision in *Maislin Industries, U. S., Inc.* v. *Primary Steel, Inc.,* 497 U. S. 116 (1990), that the filed rate doctrine bars the ICC from interpreting the unreasonable practice rule to prevent collection of a filed rate where a carrier had agreed to a lower one, the court concluded that "[t]he ICC's interpretation of [the liquidated damages] regulations . . . has no greater force than the policy rejected in *Maislin.*" 990 F. 2d, at 1514. It held that "the filed rate doctrine trumps the manner in which the ICC seeks to regulate carrier credit in this case." *Ibid.*

After the Court of Appeals issued its opinion, we decided *Reiter* v. *Cooper*, 507 U. S. 258 (1993). The Court addressed whether a shipper's unreasonable rate claim could be raised in a carrier's suit to collect the difference between the amount charged and the higher amount due under the tariff, or whether the shipper's claim had to be raised in a separate proceeding before the ICC. We held the filed rate doctrine does not bar shippers from raising claims and defenses accorded by the Act, even if this results in defeating collection of a filed rate, and allowed the shipper to allege, subject to the ordinary rules governing counterclaims, an unreasonable-rate counterclaim to the carrier's undercharge action. *Id.*, at 262–267. In light of *Reiter*, we vacated the Court of Appeals' judgment in the instant matter and remanded for further consideration. .

On remand, the Court of Appeals adhered to its earlier determination. 9 F. 3d 64 (CA9 1993). It found *Reiter* distinguishable but concluded that, even if it were apposite, *Reiter* did no more than require a balancing of the carrier's argument based on the filed rate doctrine against the ICC's argument based on the credit regulations. 9 F. 3d, at 66. It thought the balance tilted in favor of disallowing relief. A grant of an injunction would, the Court of Appeals reasoned, "permit an end-run around the filed rate doctrine" by allowing a carrier and shipper to negotiate a private discount from the filed rate, while denying the injunction would still leave the ICC with "a wide array of tools for enforcing its credit regulations." *Id.*, at 67.

We again granted certiorari, 511 U. S. 1029 (1994), and now reverse.

## II

Just as *Reiter* was in important respects "a sequel to our decision in *Maislin*," 507 U. S., at 260, this case is a sequel to our decision in *Southern Pacific Transp. Co.* v. *Commercial Metals Co.*, 456 U. S. 336 (1982). In *Commercial Metals*, the carrier released goods to the consignee before payment, but failed to investigate the consignee's credit standing, as ICC regulations required, 49 CFR § 1320.1 (1981). See 456 U. S., at 339, 341, and n. 6. When collection against the consignee proved fruitless and the carrier turned to the shipper for payment, the shipper sought to raise the carrier's violation as a defense. We held the defense improper when raised by the shipper, noting our reluctance to grant the shipper an implied remedy when the statutory scheme did not grant an express one. *Id.*, at 345–348. We went on to say, however, that the case would have been quite different had it involved the ICC's seeking injunctive relief, a remedy for which it has specific authority under the Act. We held that "[t]he remedies for a carrier's violations of the regulations are best left to the ICC for such resolution as it thinks proper," and specified that "the ICC has ample authority to police the

credit practices of carriers . . . [by] seek[ing] a federal-court injunction requiring a carrier to comply with the regulations . . . ." *Id.*, at 352, 349. We conclude that the ICC here is exercising the enforcement powers we acknowledged in *Commercial Metals.*

The Act grants the ICC broad authority to bring civil actions to enforce the statute and regulations or orders issued under it. 49 U. S. C. § 11702. As respondents themselves concede, the trustee is attempting in this case to collect liquidated damages in violation of the ICC's credit regulations. See Brief in Opposition 4–5. To the extent the injunction applies to "a bankruptcy trustee" applying liquidated damages "to aggregate *balance-due* claims sought for collection on past shipments," the ICC seeks a prospective bar to the trustee's violation of 49 CFR § 1320.2(g)(2)(iii) (1994). This aspect of the ICC's suit is, in effect, a compliance action—the precise relief the Court approved in *Commercial Metals.* To the extent the ICC seeks to enjoin collection of liquidated damages as a remedy for Transcon's lack of notification in the original bills, see 49 CFR § 1320.3(c) (1992), and nonissuance of revised bills within 90 days, see § 1320.2(g)(2)(vi), this remedy too is appropriate.

The Court's observation in *Commercial Metals* that the choice of remedies for violation of its regulations is "best left to the ICC," 456 U. S., at 352, was a particular invocation of the general principle that "the relation of remedy to policy is peculiarly a matter for administrative competence," *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 194 (1941); *ICC* v. *American Trucking Assns., Inc.*, 467 U. S. 354, 355 (1984) (ICC "has discretion to fashion remedies in furtherance of its statutory responsibilities") (citing *Trans Alaska Pipeline Rate Cases*, 436 U. S. 631, 654 (1978)). Although the ICC's authority to determine proper remedies for violations under the Act is not without limits, its judgment that a particular remedy is an appropriate exercise of its enforcement authority under 49 U. S. C. § 11702(a)(4) is entitled to some defer-

ence. Two substantial reasons support our conclusion that the remedy chosen by the agency is an appropriate one.

First, its remedy appears to the ICC, and to us, necessary to the effective enforcement of its regulations. See *Commercial Metals, supra,* at 350, 352; see also *Hewitt-Robins Inc.* v. *Eastern Freight-Ways, Inc.,* 371 U. S. 84, 88 (1962) (remedy allowed where its absence would "plac[e] the shipper entirely at the mercy of the carrier"). Were we to disallow the injunction, respondents and other trustees of bankrupt carriers would be immune, in effect, from enforcement of the credit regulations. Relief limited to prospective injunctions requiring carriers to provide notice of liquidated damages and to send revised bills could have no effect on bankrupt carriers and their trustees. Nor do the Act's remedies for unlawful rates, see 49 U. S. C. §§ 10704(b)(1), 11705(b)(3), allow for adequate enforcement of the credit regulations, for not every credit violation will result in an unlawful rate.

Second, unlike the credit regulation violated in *Commercial Metals,* which was intended to protect carriers, 456 U. S., at 345–346, the requirements for notice of liquidated damages are to protect shippers from the imposition of penalties without warning. When a carrier fails to provide notice, it is an appropriate remedy for the ICC to bar collection of the liquidated damages, for the remedy serves the regulations' intended beneficiaries. Cf. *id.,* at 344–345 (regulations do not "intimate that a carrier's violation of the credit rules [there at issue] automatically precludes it from collecting the lawful freight charge").

In short, whether or not we would allow shippers to defend against a carrier's collection action by relying on the carrier's violation of credit regulations, it follows from *Commercial Metals* and our construction of the controlling statute that the ICC has the authority and the discretion to determine appropriate remedies for these violations. Where, as here, the remedy involves "a federal-court injunction re-

quiring a carrier to comply with the regulations," *id.*, at 349; constitutes a reasonable and necessary means to effect enforcement of the ICC's credit regulations; and protects the intended beneficiaries of the violated regulations, we believe the injunction is authorized under the Act.

In *Maislin* we concluded the ICC's policy and its interpretation of the Act were "flatly inconsistent with the statutory scheme as a whole." 497 U. S., at 131. We rejected the ICC's enforcement policy, just as we had declined to permit general, nonstatutory equitable defenses in a collection suit. Our concern was that the policy would undercut the whole filed rate system, thus permitting shippers to enforce secret, negotiated, unfiled rates and allowing carriers to discriminate in favor of certain customers. *Id.*, at 130–131.

Neither *Maislin* nor our other filed rate cases suggest that the filed rate doctrine prohibits the ICC from requiring departure from a filed rate when necessary to enforce other specific and valid regulations adopted under the Act, regulations that are consistent with the filed rate system and compatible with its effective operation. Carriers must comply with the comprehensive scheme provided by the statute and regulations promulgated under it, and their failure to do so may justify departure from the filed rate. In *Reiter*, for example, we confirmed that the filed rate doctrine "assuredly does not preclude avoidance of the tariff rate . . . through claims and defenses that are specifically accorded by the [Act] itself." 507 U. S., at 266 (emphasis deleted). Here, of course, the ICC can and does rely upon *Commercial Metals*, governing the powers of the ICC and not the defenses available to shippers. As we acknowledged in *Maislin*, the ICC can require that filed rates be " 'suspended or set aside' " in various circumstances. 497 U. S., at 126 (quoting *Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156, 163 (1922)); see also *ICC* v. *American Trucking Assns.*, *supra*, at 360 ("[T]he Commission may conduct an investigation into a tariff's lawfulness at any time after it has gone into effect," and

where a tariff violates the Act, "the Commission has authority to cancel the tariff and require that a reasonable and non-discriminatory rate apply in the future. § 10704(b)(1)").

Any remaining doubts as to the appropriateness of the relief sought are dispelled upon close examination of respondents' particular contention that an injunction here would displace the tariff system by substituting a private agreement for the filed rate. This is not so. The charge that cannot be collected is, as respondents themselves concede, Tr. of Oral Arg. 24, the charge for liquidated damages. The ICC has said in a regulation promulgated under the Act that "[t]he difference between the discount and the full rate constitutes a carrier's liquidated damages for its collection effort." 49 CFR § 1320.2(g)(1)(ii) (1994); see 49 U. S. C. § 10743(b)(1) (Act authorizes the extension of credit—and therefore any liquidated damages resulting from the extension of credit—only pursuant to ICC regulations). The regulation is entitled to deference as an interpretation of the Act. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984). Thus, the ICC is not seeking to enforce a secret, unfiled rate in place of a filed rate, but is seeking to enforce the rate for shipping over the rate for shipping plus collection efforts. See *Hewitt-Robins Inc.* v. *Eastern Freight-Ways, Inc.,* 371 U. S., at 88 (enforcing lower of two filed rates in no manner "hampers the efficient administration of the Act").

## III

The Act by express terms authorizes the ICC to promulgate credit regulations. It also gives the ICC "the power to seek a federal-court injunction requiring a carrier to comply with [its credit] regulations." *Commercial Metals,* 456 U. S., at 349 (citation omitted). The injunctive relief sought by the ICC is both necessary and appropriate to effective enforcement of its valid credit regulations, and does not "permi[t] the very price discrimination that the Act by its

terms seeks to prevent." *Maislin,* 497 U. S., at 130. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*